**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**J.B. HUNT TRANSPORT, INC.**                                                      **PLAINTIFF**

**vs.**                                         **CASE NO. 5:23-cv-05083**

**TRUCKSMARTER, INC.**                                                         **DEFENDANT**

**FIRST AMENDED COMPLAINT**

Plaintiff, J.B. Hunt Transport, Inc. ("J.B. Hunt"), by its attorneys, Friday, Eldredge & Clark, LLP, for its First Amended Complaint against Defendant, TruckSmarter, Inc. ("TruckSmarter"), states as follows:

**NATURE OF THE DISPUTE**

1.      This action involves TruckSmarter's improper acquisition and use of J.B. Hunt's trade secrets and other confidential information.  TruckSmarter solicited motor carriers with whom J.B. Hunt has contractual relationships ("Carriers") and requested that they share their log-on credentials in violation of their agreements with J.B. Hunt.  TruckSmarter did so in order to access J.B. Hunt's trade secrets and other confidential information to compete with J.B. Hunt and also to leverage that information to advance its other commercial purposes, including its factoring services.  Without J.B. Hunt's authorization, TruckSmarter accessed trade secrets and confidential information on J.B. Hunt's computer systems and servers in violation of state and federal law.  TruckSmarter then converted and misappropriated the trade secrets and confidential information for TruckSmarter's commercial benefit.  Despite J.B. Hunt's notice and demand that TruckSmarter cease and desist, its wrongful conduct continues and is causing J.B. Hunt irreparable harm.

**PARTIES**

2.      Plaintiff J.B. Hunt Transport, Inc. is a corporation organized under the laws of the

State of Georgia, having its principal place of business in Lowell, Arkansas.

3.     Upon information and belief, Defendant TruckSmarter is a corporation organized under the laws of the State of Delaware, having its principal place of business in San Francisco, California.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and the amount in controversy, exclusive of costs and interest, exceeds $75,000.

5.     Additionally, this Court has original subject matter jurisdiction over Count 3 of this matter pursuant to 28 U.S.C. § 1331 because this claim arises "under the Constitution, laws, or treaties of the United States."  Specifically, Plaintiff asserts a violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030(g)).  The Court may exercise supplemental jurisdiction over Plaintiff's remaining state law claims pursuant to 28 U.S.C. §§ 1367 and 1441(c) because the state claims are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

6.     The Court has personal jurisdiction over TruckSmarter because it has sufficient minimum contacts with the State of Arkansas and has directed its tortious and unlawful activities at the State of Arkansas.  TruckSmarter purposefully directed its activities at Arkansas because that is where J.B. Hunt is located, where the trade secrets and other confidential information were maintained, and where J.B. Hunt's computer systems and servers are located.  TruckSmarter knew or reasonably could have known that its actions would have an impact in Arkansas.

7.     The Court also has personal jurisdiction over TruckSmarter because, as set forth in Paragraphs 60-72 and 152-163 herein, TruckSmarter conspired with carriers located in Arkansas

("Arkansas Carriers").  TruckSmarter entered into agreements with the Arkansas Carriers, and these Arkansas Carriers have sufficient minimum contacts with Arkansas.  The Arkansas Carriers' activities in Arkansas were in furtherance of the conspiracy and may be attributed to TruckSmarter.  As set forth herein, the conspiracy impacted the forum because the property that is the subject of this action (*i.e.*, the trade secrets and confidential information that were misappropriated and the computer systems and servers that were improperly accessed) are located in Arkansas.  As set forth in Paragraph 162 herein, TruckSmarter and the Arkansas Carriers with whom it conspired knew or reasonably could have known that their actions would have an impact in Arkansas.

8.     Venue is proper in the Fayetteville Division of the Western District of Arkansas pursuant to 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in Lowell, Arkansas, and "a substantial part of property that is the subject of the action is situated" in Lowell, Arkansas, within the Fayetteville Division of the Western District of Arkansas.  Specifically, the confidential information and trade secrets that were misappropriated and converted are maintained on servers located in Lowell, and the computer and computer systems that were improperly accessed are located in Lowell.  *See* Ark. Code Ann. § 5-41-105 (providing that venue is proper in any county in which any computer, computer system, or computer network that is an object or instrument of the violation is located).

## FACTUAL ALLEGATIONS

### *J.B. Hunt's Carrier 360® Application*

9.     A load board is an online marketplace matching shippers and freight brokers with motor carriers available to take their loads. Shippers post the loads that they need moved, and carriers place offers on the loads.  The load is booked to the qualified motor carrier with the best offer within a designated timeframe.

10.     J.B. Hunt's proprietary Carrier 360 application ("Carrier 360") provides motor carriers with access to a load board designed and maintained by J.B. Hunt.  Carrier 360 allows motor carriers vetted and approved by J.B. Hunt to access, view, place offers on, and book J.B. Hunt loads.

11.     The more a Carrier uses Carrier 360, the more visibility it receives.  For example, the higher-tier Carriers have visibility into the names of the shippers, the time of pick-ups and drop-offs, and the shipping routes (collectively, "**Higher Tier Data**").

12.     The Higher Tier Data is available only through Carrier 360 to higher-tier Carriers.

13.     Because of J.B. Hunt's size and sophistication, Carrier 360 provides access to more loads and greater visibility into the load details than smaller motor carriers otherwise would be able to access through other load boards.

14.     The loads that are available on Carrier 360 are available only through legitimate, permitted access to that platform and nowhere else.

15.     The loads available on Carrier 360 can be offered and booked only in Carrier 360.

16.     The Higher-Tier Data is confidential and a trade secret of J.B. Hunt.

17.     J.B. Hunt uses the Higher-Tier Data to incentivize Carriers to book with it and to retain the higher-tier Carriers.

18.     When Carriers place offers on and book loads through Carrier 360, J.B. Hunt acquires and collects valuable data ("**Bid Data**").  The Bid Data includes the prices of the offers made on the load and the price for which the load ultimately was booked.

19.     The Bid Data allows J.B. Hunt to identify the most desirable loads, lanes, times, and shippers so that it can improve its services and tailor loads to certain Carriers.

20.     The Bid Data allows J.B. Hunt to conduct real-time price optimization.

21.     The Bid Data is confidential and a trade secret that J.B. Hunt uses for commercial purposes and intends to use for commercial purposes in the future.

22.     Data available on Carrier 360, including the Higher Tier Data and the Bid Data, is maintained and housed on computer systems and servers located in Lowell, Arkansas.

*J.B. Hunt's Carriers Are Subject to Confidentiality Agreements*

23.     Because the information accessible through Carrier 360 includes proprietary trade secrets and other confidential information, J.B. Hunt takes great strides to protect its information.

24.     All information accessible through Carrier 360 is password-protected and requires a user log-in.

25.     In order to obtain a user log-in, a motor carrier must be vetted and approved by J.B. Hunt.

26.     As a condition of accessing the information available on Carrier 360, motor carriers must agree to Carrier Terms of Service, inclusive of Terms and Conditions, a true and accurate copy of which is attached hereto as **Exhibit A**.

27.     For example, the Terms and Conditions include the following provisions: "You agree not to share or disclose Your user identification and/or password unless expressly authorized by J.B. Hunt under emergency business conditions.  You are responsible for maintaining the confidentiality of Your access information and for controlling access to Your Account." **Ex. A** at 2.

28.     No one receives access to Carrier 360, including the Higher Tier Data and the Bid Data, without agreeing to these Terms and Conditions.

29.     The data available on Carrier 360 is provided and published based on the belief that only J.B. Hunt-vetted and J.B. Hunt-approved Carriers will be able to view it and access it.

***TruckSmarter and Its Application***

30.     Founded in April 2021, TruckSmarter purports to offer a free load board to motor carriers nationwide.

31.     Upon information and belief, TruckSmarter served approximately 100,000 motor carriers in the United States by the end of 2022.

32.     The TruckSmarter load board is created by aggregating data from other sources and making it available through a centralized application.

33.     TruckSmarter's website explains: "Our load board pulls loads from other sources into one location so it is easier for independent owner operators to find loads. Instead of paying for high priced subscriptions or searching for loads in multiple places our goal is to save you time and money by being a single source to search, bid, book, and manage your loads." *See* https://www.trucksmarter.com/load-board (last visited May 15, 2023).

34.     Since 2021, TruckSmarter has raised more than $44 million in capital to build its platform.

35.     Upon information and belief, TruckSmarter makes its revenue by offering truckers same-day payments for each load through *factoring* services. Motor carriers often must wait up to one month after a load is completed to receive payment.  TruckSmarter takes 1.5% off a load's revenue for loads that it pays the same day.

36.     As a result, the more loads that motor carriers book through the TruckSmarter platform, the more revenue potential TruckSmarter has.

***TruckSmarter's Wrongful Conduct***

37.     As TruckSmarter's own website acknowledges, TruckSmarter obtains its information and loads from other sources.

38.     This includes obtaining proprietary trade secrets and other confidential information from Carrier 360 without J.B. Hunt's authorization.

39.     To perpetrate this scheme, TruckSmarter solicits Carriers approved to use Carrier 360 ("J.B. Hunt Carriers").

40.     TruckSmarter then requests that the J.B. Hunt Carriers share their log-on credentials for Carrier 360 as reflected in the screenshot from the TruckSmarter platform below.



41.     TruckSmarter's website states, "By connecting your broker accounts to TruckSmarter, you can enable bidding and booking for loads that are posted on the TruckSmarter load board!"   *See*   https://help.trucksmarter.com/hc/en-us/articles/6104730456340-Connecting-broker-accounts (last visited May 15, 2023).   The website explains how to connect broker accounts.   *Id*.   Specifically, the TruckSmarter website instructs: "At the credentials pane, submit your broker username and password that you use to login with the broker."   *Id*.

42.     TruckSmarter solicits the J.B. Hunt Carriers and requests their log-on credentials knowing that doing so constitutes a breach of the J.B. Hunt Carriers' agreements with J.B. Hunt.

43.     By using the J.B. Hunt Carriers' credentials, TruckSmarter connects to, interfaces with, and accesses Carrier 360.

44.     Through this unauthorized access to Carrier 360, TruckSmarter is able to access J.B. Hunt's proprietary trade secrets and other confidential information.

45.     By improperly accessing the credentials of one of the J.B. Hunt Carriers in the higher-tier, TruckSmarter is able to obtain the Higher Tier Data.

46.     It does not stop there. TruckSmarter publishes and shares the information from Carrier 360, including Higher Tier Data, on the TruckSmarter platform.

47.     TruckSmarter shares this information with motor carriers that have not been vetted or approved by J.B. Hunt and that notably are not subject to confidentiality obligations.

48.     By publicly providing information that ordinarily would be accessible only to J.B. Hunt's highest tier Carriers, TruckSmarter is disincentivizing motor carriers from working with J.B. Hunt.

49.     Still, there is more.  Not only are J.B. Hunt loads and Higher-Tier data visible on the TruckSmarter platform, but the J.B. Hunt loads also are offered on and booked directly through the TruckSmarter application.

50.     By using the J.B. Hunt Carriers' credentials, TruckSmarter gains full functionality on Carrier 360.  This allows a user of the Truck Smarter platform to place offers on and book J.B. Hunt loads directly through the TruckSmarter platform.

51.     If a J.B. Hunt load is offered on or booked through the TruckSmarter application, J.B. Hunt does not have visibility into the Bid Data for that load.

52.     Additionally, for any J.B. Hunt Carrier that provides its Carrier 360 log-on credentials to TruckSmarter, TruckSmarter can view that Carrier's historical Bid Data.

53.     TruckSmarter has admitted that it not only is accessing J.B. Hunt's Higher-Tier Data and Bid Data, but it also is extracting that data.

54.     In July 2022, TruckSmarter CEO wrote to J.B. Hunt, "While we do not believe we are doing anything wrong with how we access data today, we can pause extractions leading up to a scheduled meeting so we can have a conversation in good faith."

55.     Notably, at that time, TruckSmarter agreed to pause extracting data, but it did not agree to stop accessing data.  At this time, J.B. Hunt has not been able to determine whether extractions have resumed, but TruckSmarter remains in a position to extract such data, including Higher-Tier Data, at any time.

56.     TruckSmarter is capturing and extracting the Higher-Tier Data and Bid Data for its own competitive advantage.

57.     TruckSmarter's own Terms of Service confirm its knowledge that its conduct is improper.

58.     TruckSmarter's Terms of Service, attached hereto as **Exhibit B**, expressly acknowledge that the information provided on the TruckSmarter platform is protected. "The visual interfaces, graphics, design, compilation, information, data, computer code (including source code or object code), products, software, services, and all other elements of the Service ("Materials") provided by TruckSmarter are protected by intellectual property and other laws. All Materials included in the Service are the property of TruckSmarter or its third-party licensors. Except as expressly authorized by TruckSmarter, you may not make use of the Materials. TruckSmarter reserves all rights to the Materials not granted expressly in these Terms." Ex. B, § 6.

59.     TruckSmarter likewise takes steps to protect the information on its platform through password protection. *Id.*, § 3.

***TruckSmarter Induces Arkansas-Based Carriers To Breach Their Agreements with J.B. Hunt***

60.     When Carriers sign up with TruckSmarter, they are invited to share their Carrier 360 credentials.

61.     J.B. Hunt estimates that more than 100 J.B. Hunt Carriers have shared their log-on credentials with TruckSmarter.

62.     J.B. Hunt has confirmed that at least two of its Arkansas-based Carriers have at one time been TruckSmarter users and have shared their log-on credentials with TruckSmarter.

63.     For example, Trejo's Transport, LLC currently is a J.B. Hunt Carrier organized under the laws of the State of Arkansas with its principal place of business in Farmington, Arkansas.

64.     J.B. Hunt has confirmed that Trejo's Transport, LLC is a TruckSmarter carrier and has shared its J.B. Hunt log-on credentials with TruckSmarter.

65.     In addition, TruckSmarter's website features Paye Logistics LLC from Little Rock, Arkansas as one of its testimonials.  An image of TruckSmarter's website is included below:



"In a ever changing industry where rates are not only based on truck to load ratio, but also on the competition rates for the same lane, you have to see everything. Just use TruckSmarter 🥔."

EMMANUEL P.
Paye Logistics LLC — Little Rock, AR

66.     Paye Logistics is a registered motor carrier organized under the laws of the State of Arkansas with its principal place of business in Little Rock, Arkansas.

67.     Paye Logistics, LLC was a J.B. Hunt-approved Carrier until March 22, 2022.  Upon information and belief, Paye Logistics, LLC was a client of TruckSmarter prior to March 22, 2022.

68.     TruckSmarter solicited J.B. Hunt Carriers, which includes the Arkansas Carriers.

69.     TruckSmarter requested that J.B. Hunt Carriers, including the Arkansas Carriers, provide their log-on credentials for Carrier 360.

70.     By downloading, installing, accessing, or using the TruckSmarter application, the J.B. Hunt Carriers, including those in Arkansas, enter into an agreement with TruckSmarter.  Ex. B, § 1-2.

71.     The J.B. Hunt Carriers, including the Arkansas Carriers, provide their Carrier 360 log-on credentials in furtherance of this agreement.

72.    The Arkansas Carriers undertake activities in furtherance of the agreement from Arkansas, including providing their log-on credentials and accessing and using the TruckSmarter platform.

***J.B. Hunt Has Expended Time and Resources Investigating the Harm Caused by TruckSmarter and Taking Remedial Measures***

73.    Since discovering TruckSmarter's scheme, J.B. Hunt has been diligent in conducting a full investigation into the facts.

74.    J.B. Hunt has taken steps to determine the extent of TruckSmarter's unauthorized access, to investigate the harm caused by such unauthorized access, and to take the necessary and appropriate remedial measures.  These efforts include, without limitation, fact-gathering, engaging in conversations with TruckSmarter on this issue since June 2022, and attempting to prevent further unauthorized access. These efforts include, without limitation, many hours of valuable time of J.B. Hunt's employees away from their day-to-day responsibilities.

75.    J.B. Hunt's application security team has spent more than ten hours researching solutions to prevent TruckSmarter from accessing J.B. Hunt's trade secrets and other data and developing implementation strategies.

76.    J.B. Hunt's networking team has spent more than 10 hours identifying TruckSmarter's conduct and blocking IP ranges.

77.    J.B. Hunt's application development team has spent more than 450 hours identifying and documenting TruckSmarter's conduct, researching potential solutions to prevent TruckSmarter's unauthorized access, preventing TruckSmarter's access, and switching systems and migrating data to attempt to prevent further unauthorized access.

78.    J.B. Hunt's infrastructure team has spent more than 10 hours identifying and documenting the data that is being accessed without authorization.

79.     Other key engineering personnel at J.B. Hunt have spent at least 100 hours directing and coordinating these efforts.

80.     A conservative estimate of these employees' time is approximately $60,000.

81.     These efforts are ongoing, and these costs continue to accumulate.

***J.B. Hunt's Good Faith Attempts To Resolve This Dispute Have Failed***

82.     J.B. Hunt put TruckSmarter on notice that its scheme violates J.B. Hunt's Carrier Terms and Condition and sent TruckSmarter a copy of the Carrier Terms and Conditions.

83.     TruckSmarter representatives participated in a call to discuss its conduct with J.B. Hunt representatives about a month later.

84.     During these discussions, TruckSmarter did not deny the conduct described above and admitted TruckSmarter is extracting and capturing the Bid Data.

85.     TruckSmarter has rejected requests to cease and desist its wrongful conduct and continues its wrongful conduct to present day.

## FIRST CLAIM FOR RELIEF
### (Tortious Interference with Contracts)

86.     J.B. Hunt adopts and fully incorporates the foregoing paragraphs of this Complaint as if set forth herein word for word.

87.     J.B. Hunt Carriers agree to be bound by the Carrier Terms and Conditions in order to access, view, place offers on, and book J.B. Hunt loads.

88.     The Terms and Conditions are valid contracts.

89.     Through these Terms and Conditions, J.B. Hunt maintains valid contractual relationships and business expectancies with the J.B. Hunt Carriers.

90.     As part of these contractual relationships, the J.B. Hunt Carriers are prohibited from sharing their log-on credentials.

91.     J.B. Hunt had a reasonable expectation that the J.B. Hunt Carriers would continue to honor their obligations under the Terms and Conditions.

92.     J.B. Hunt similarly had a reasonable expectation in continuing to do business with the J.B. Hunt Carriers.

93.     Since at least June 2022, TruckSmarter has had knowledge of the contractual relationship and business expectancy between J.B. Hunt and the J.B. Hunt Carriers, including the prohibition on sharing log-on credentials.

94.     TruckSmarter has intentionally interfered with J.B. Hunt's contractual relationships with its Carriers and has caused the J.B. Hunt Carriers to breach the Carrier Terms and Conditions by (a) soliciting the J.B. Hunt Carriers; (b) requesting J.B. Hunt's Carriers' log-on credentials; and (c) causing J.B. Hunt's Carriers to share their log-on credentials.

95.     TruckSmarter also has intentionally interfered with J.B. Hunt's business expectancy with its Carriers by moving the offer and booking activity from Carrier 360 to the TruckSmarter platform.

96.     The conduct of TruckSmarter as set forth herein was intentional and improper.

97.     As a result of TruckSmarter's actions, J.B. Hunt Carriers have breached the Terms and Conditions.

98.     As a result of TruckSmarter's actions, J.B. Hunt Carriers have placed offers on and booked J.B. Hunt loads on the TruckSmarter platform that they and others would have placed offers on and booked through Carrier 360 but for TruckSmarter's wrongful conduct.

99.     J.B. Hunt has been proximately harmed by TruckSmarter's wrongful conduct and tortious interference, including by suffering damages in an amount to be determined by the jury.

100.    J.B. Hunt's damages include, but are not limited to, lost profits from losing loads that it otherwise would have booked but for TruckSmarter improper interference, losing access to the Bid Data that it otherwise would have had but for TruckSmarter improper interference, and damages suffered as a result of the Higher Tier Data being shared publicly.

101.    TruckSmarter's conduct was improper, including but not limited to the following reasons:

a.    TruckSmarter caused J.B. Hunt Carriers to breach the Terms and Condition so that TruckSmarter could acquire unauthorized access to J.B. Hunt's trade secrets and other confidential information;

b.    TruckSmarter caused J.B. Hunt Carriers to breach the Terms and Condition so that TruckSmarter could gain an unfair commercial advantage over J.B. Hunt;

c.    TruckSmarter caused J.B. Hunt Carriers to breach the Terms and Condition so that TruckSmarter could wrongfully acquire trade secrets that J.B. Hunt has spent years acquiring and protecting;

d.    TruckSmarter caused J.B. Hunt Carriers to breach the Terms and Condition to suppress fair competition; and

e.    TruckSmarter caused J.B. Hunt Carriers to breach the Terms and Condition to access J.B. Hunt's trade secrets and other confidential information in order to compete with J.B. Hunt.

## SECOND CLAIM FOR RELIEF
### (Computer Trespass under Ark. Code Ann. § 5-41-104)

102.    J.B. Hunt adopts and fully incorporates the foregoing paragraphs of this Complaint as if set forth herein word for word.

103.    TruckSmarter intentionally and without authorization accessed J.B. Hunt's

computer, computer system, computer network, computer program, or data in violation of Ark. Code Ann. § 5-41-104.

104.    As alleged in the Complaint, through intentional and unauthorized access, TruckSmarter accessed J.B. Hunt's confidential information and trade secrets without J.B. Hunt's knowledge or consent.

105.    Further, as alleged herein, TruckSmarter intentionally and without authorization extracted data from J.B. Hunt's computer networks or systems.

106.    J.B. Hunt Carriers permitted TruckSmarter to access J.B. Hunt's trade secrets and other confidential information without J.B. Hunt's knowledge, consent, or participation.

107.    TruckSmarter knew that J.B. Hunt did not know about and had not consented to such access or extraction, yet TruckSmarter carried on with its scheme.

108.    TruckSmarter has continued to access J.B. Hunt's computer, computer system, computer network, computer program, computer server, or data even after being put on notice that J.B. Hunt does not consent to such conduct.

109.    Arkansas Code Annotated § 5-41-106 provides J.B. Hunt the legal vehicle to recover civil damages from TruckSmarter for their criminal acts, including but not limited to actual damages, costs of suit, and lost profits.

110.    As a direct and proximate result of TruckSmarter's foregoing acts, J.B. Hunt has been damaged and has suffered and will continue to suffer immediate and irreparable injury. J.B. Hunt is informed and believes that unless said conduct is enjoined by this Court, TruckSmarter will continue those activities and continue to irreparably harm J.B. Hunt.

16

111.     This injury includes damages that would be hard to quantify, as well as harm to J.B. Hunt's goodwill and reputation that damages cannot remedy. As such, J.B. Hunt has no adequate remedy at law.

112.     Arkansas Code Annotated § 5-41-106 permits this Court to take any action that helps "to protect the secrecy and security of the computer, computer system, computer network, computer program, computer software, and data involved in order to prevent possible reoccurrence of the same or a similar act by another person and to protect any trade secret of any party."

113.     J.B. Hunt therefore requests that this Court order TruckSmarter to cease and desist from accessing or extracting any data from J.B. Hunt's computer networks and systems in any form or fashion whatsoever and to turn over all data and information previously extracted from J.B. Hunt.

## THIRD CLAIM FOR RELIEF

### (Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g))

114.     J.B. Hunt adopts and fully incorporates the foregoing paragraphs of this Complaint as if set forth herein word for word.

115.     The J.B. Hunt computer systems to which TruckSmarter gained access constitute computers within the meaning of the Computer Fraud and Abuse Act (CFAA) because they store electronic data.

116.     The J.B. Hunt computer systems to which TruckSmarter gained access constitute protected computers within the meaning of the CFAA because they are used in or affecting interstate or foreign commerce or communication.

117.     TruckSmarter intentionally accessed J.B. Hunt's computer systems.

118.     TruckSmarter accessed J.B. Hunt's computer systems without authorization, namely by inducing J.B. Hunt Carriers to share their log-on credentials in breach of the Carrier

Terms and Conditions.

119.    Alternatively, TruckSmarter's access exceeded its authorization because the computer systems were accessed to obtain and/or to use information from J.B. Hunt's protected computers, namely trade secrets belonging to J.B. Hunt in competition with J.B. Hunt.

120.    TruckSmarter intentionally and without authorization accessed J.B. Hunt's computer systems in order to obtain information from the protected computers, namely trade secrets and other confidential information belonging to J.B. Hunt.

121.    As a result of TruckSmarter's conduct, J.B. Hunt has suffered financial loss in an amount greater than $5,000.00 and other losses in responding to TruckSmarter's unauthorized access, determining the extent of TruckSmarter's unauthorized access, investigating the harm caused by such unauthorized access, and taking necessary and appropriate remedial measures including attempting to prevent further unauthorized access.

122.    Thus, TruckSmarter's unauthorized access has caused J.B. Hunt, and will continue to cause J.B. Hunt, to lose in excess of $5,000 during any one-year period.

123.    As such, J.B. Hunt may maintain a private right of action for TruckSmarter's violation of the CFAA.  *See* 18 U.S.C. § 1030(g).

124.    J.B. Hunt has suffered and will continue to suffer damages and losses in an amount to be determined at trial which are ongoing and unabated at the time of filing this Complaint.

## FOURTH CLAIM FOR RELIEF
### (Conversion)

125.    J.B. Hunt adopts and fully incorporates the foregoing paragraphs of this Complaint as if set forth herein word for word.

126.    J.B. Hunt is entitled to exclusively possess the data and information housed on its computer systems and servers.

127.    J.B. Hunt is entitled to exclusively possess the Bid Data.

128.    J.B. Hunt is entitled to exclusively possess the Higher Tier Data.

129.    TruckSmarter intentionally and purposely exercised dominion or control over data on J.B. Hunt's computer systems, servers, Bid Data, and Higher Tier Data.

130.    Indeed, TruckSmarter's CEO admitted that TruckSmarter was "extract[ing]" data from J.B. Hunt.

131.    TruckSmarter continues to exercise dominion and control over this data.

132.    Specifically, J.B. Hunt has a vast network of carriers who place offers on and book loads through Carrier 360.  Carrier 360 contains the Higher-Tier Data.  Carrier 360 also captures the Bid Data.

133.    TruckSmarter solicited J.B. Hunt Carriers and requested that they share their log-on credentials in breach of the Carrier Terms and Conditions.

134.    Once the log-on credentials were shared, TruckSmarter obtained access to the Higher-Tier Data and the historical Bid Data for the carrier that provided its credentials.

135.    As a result, J.B. Hunt loses exclusive access to the Higher-Tier Data and the historical Bid Data over which it otherwise would have had exclusive dominion and control but for TruckSmarter's wrongful conduct.

136.    Further, all loads offered on and booked through the TruckSmarter application by an approved-J.B. Hunt Carrier are no longer visible to J.B. Hunt.  As a result, J.B. Hunt loses access to Bid Data over which it otherwise would have had exclusive dominion and control but for TruckSmarter's wrongful conduct.

137.    J.B. Hunt has been proximately harmed by TruckSmarter's wrongful conduct in any amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### (Violation of the Arkansas Trade Secrets Act)

138.    J.B. Hunt adopts and fully incorporates the foregoing paragraphs of this Complaint as if set forth herein word for word.

139.    The Higher Tier Data constitutes a trade secret within the meaning of the Arkansas Trade Secrets Act.  The Higher Tier Data is a compilation of information about loads that would not be readily ascertainable by proper means, including without limitation the name of the shipper, the pick-up and drop-off times, and the shipping routes.

140.    J.B. Hunt's Bid Data constitutes a trade secret within the meaning of the Arkansas Trade Secrets Act.  The Bid Data is a compilation of information about loads that would not be readily ascertainable by proper means, including without limitation the offers made on loads and the transactional price of the booked loads.

141.    The Higher Tier Data and Bid Data derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who could obtain an economic advantage from its disclosure or use.  TruckSmarter's actions in this case confirm that the Higher Tier Data and Bid Data have value. If the information did not have independent economic value or could be readily ascertained by other proper means, then there would have been no reason for TruckSmarter to extract it from J.B. Hunt for its own later competitive use.

142.    The Higher Tier Data incentivizes motor carriers to work with J.B. Hunt and allows J.B. Hunt to attract and retain the highest quality motor carriers.

143.    The Bid Data allows J.B. Hunt to determine the most desired loads, lanes, and times; to set competitive pricing in real time; to conduct price optimization; and to customize marketing to motor carriers.

20

144.    The Higher Tier Data and Bid Data are, and at all relevant times have been, the subject of J.B. Hunt's reasonable efforts in the circumstances to maintain their secrecy.  The information is maintained on a password-protected system and access is granted only to vetted and approved J.B. Hunt Carriers.  The Carrier Terms and Conditions contain a provision protecting the information from disclosure stating: "You agree not to share or disclose Your user identification and/or password unless expressly authorized by J.B. Hunt under emergency business conditions. You are responsible for maintaining the confidentiality of Your access information and for controlling access to Your Account." Ex. A at 2.

145.    TruckSmarter disclosed and used these trade secrets without consent and acquired it from J.B. Hunt Carriers who were under an obligation to maintain its secrecy.

146.    TruckSmarter misappropriated J.B. Hunt's trade secrets in violation of the Arkansas Trade Secrets Act (a) by acquiring the Higher Tier Data and Bid Data while knowing or having reason to know that the Higher Tier Data and Bid Data were acquired by improper means and (b) by using the Higher Tier Data and Bid Data without authorization after the trade secrets were acquired through improper means.

147.    TruckSmarter's conduct was improper within the meaning of the ATSA because it involved conversion, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, and tortious interference with J.B. Hunt's contractual commitments regarding confidentiality.

148.    The timing and frequency of TruckSmarter's conduct demonstrate that the conduct was willful and malicious.

149.     As a result of TruckSmarter's conduct to date, J.B. Hunt has suffered actual loss, including damages in the value and future value of the trade secrets that have been misappropriated, lost goodwill, lost profits, and incurred attorneys' fees.

150.     As a direct and proximate result of TruckSmarter's threatened future misappropriation, J.B. Hunt will continue to suffer immediate and irreparable injury. J.B. Hunt is informed and believes that unless said conduct is enjoined by this Court, TruckSmarter will continue those activities and continue to irreparably harm J.B. Hunt.  This injury includes damages that would be hard to quantify, as well as harm to J.B. Hunt's goodwill and reputation that damages cannot remedy. As such, J.B. Hunt has no adequate remedy at law.

151.     Pursuant to Arkansas Code Annotated § 4-75-604, J.B. Hunt also seeks injunctive relief related to TruckSmarter's threatened misappropriation of J.B. Hunt's trade secrets.

### SIXTH CLAIM FOR RELIEF
#### (Civil Conspiracy)

152.     J.B. Hunt adopts and fully incorporates the foregoing paragraphs of this Complaint as if set forth herein word for word.

153.     TruckSmarter entered into an agreement with J.B. Hunt's Carriers to accomplish a purpose that is unlawful or oppressive or to accomplish, by unlawful or oppressive means, a purpose that is not in itself unlawful or oppressive (the "Conspiracy").

154.     By downloading, installing, accessing, or using the TruckSmarter application, the J.B. Hunt Carriers entered into an agreement with TruckSmarter.  *See* Ex. B at 1-2.

155.     The J.B. Hunt Carriers undertake activities in furtherance of this agreement, including offering on and booking loads on the TruckSmarter platform.

156.     The J.B. Hunt Carriers provide their Carrier 360 log-on credentials in furtherance of the agreement.

157.    The Arkansas Carriers take the above-mentioned steps in furtherance of the agreement in Arkansas.

158.    The Conspiracy is specifically evidenced by the following non-exhaustive list of circumstances:

    a. TruckSmarter solicits J.B. Hunt Carriers.

    b. TruckSmarter requests J.B. Hunt Carriers' log-on credentials for Carrier 360.

    c. The J.B. Hunt Carriers provide their log-on credentials for Carrier 360.

    d. Through the unauthorized use of the J.B. Hunt Carriers' credentials, TruckSmarter accesses and integrates with Carrier 360.

    e. Through the unauthorized use of the J.B. Hunt Carriers' credentials, TruckSmarter accesses, uses, and extracts Higher-Tier Data and historical Bid Data for its own financial and commercial benefit,

    f. Through the unauthorized use of the J.B. Hunt Carriers' credentials, TruckSmarter accesses, uses, and extracts Higher-Tier Data and historical Bid Data hosted on J.B. Hunt's computer systems and servers.

    g. The J.B. Hunt Carriers subsequently use the TruckSmarter platform to place offers on and book loads such that TruckSmarter obtains Bid Data to which it would not otherwise have had access but for TruckSmarter's wrongful conduct.

    h. TruckSmarter uses and extracts this data for its own benefit.

159.    TruckSmarter never sought the permission or consent from J.B. Hunt to take the above-mentioned actions.

160.    TruckSmarter is conspiring with certain J.B. Hunt Carriers to convert and misappropriate J.B. Hunt's trade secrets and other confidential information in a manner that

violates Arkansas and federal law (as alleged above) so that TruckSmarter could use the information for financial gain and in competition with J.B. Hunt.

161.    TruckSmarter intends to harm J.B. Hunt and to benefit itself by effectuating the Conspiracy.

162.    TruckSmarter and the J.B. Hunt Carriers who conspired with TruckSmarter knew or reasonably could have known that the Conspiracy would impact Arkansas and be felt in Arkansas for at least the following reasons:

a.   The J.B. Hunt Carriers agreed to maintain the confidentiality of its log-on credentials in the Carrier Terms and Conditions, which contained an Arkansas choice of law and Arkansas venue provision;

b.   TruckSmarter induced the J.B. Hunt Carriers to breach the Carrier Terms and Conditions;

c.   TruckSmarter accessed J.B. Hunt's trade secrets, confidential information, computer systems, and servers knowing that J.B. Hunt did not authorize or consent to such conduct; and

d.   TruckSmarter and the J.B. Hunt Carriers took the steps listed above while knowing that J.B. Hunt, as well as its trade secrets, confidential information, computer systems, and servers were located in Arkansas.

163.    The Conspiracy has proximately caused damages to J.B. Hunt in an amount to be proven at trial.

## PUNITIVE DAMAGES & OTHER MATTERS

164.    Due to the egregious, fraudulent, and intentional misconduct of TruckSmarter described above, J.B. Hunt is entitled to punitive damages in an amount to be determined by the

jury.  In addition to being intentional, TruckSmarter knew or ought to have known, in the light of the surrounding circumstances, that its conduct would naturally and probably result in damage to J.B. Hunt, and it nonetheless continued such conduct with malice and/or in reckless disregard of the consequences from which malice may be inferred.

165.    J.B. Hunt requests a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, J.B. Hunt Transport Services, Inc., prays as follows:

(a)    Judgment in J.B. Hunt's favor and against TruckSmarter on all causes of action alleged herein;

(b)    Compensatory damages as a result of TruckSmarter's unlawful acts and omissions in an amount to be proven at trial, including but not limited to the value of the trade secrets that have been misappropriated as of the date of judgment, together with reasonable attorneys' fees, pre-judgment and post-judgment interest as allowed by law, costs, and additional costs of collection;

(c)    Punitive damages in an amount to be proven at trial and sufficient in amount to punish and deter the egregious, intentional, and malicious conduct described in this Complaint;

(d)    A permanent injunction barring TruckSmarter from:

a.   Tortiously interfering with J.B. Hunt's Carrier Terms and Conditions;

b.   Accessing J.B. Hunt's computer, computer system, computer network, computer program, or data;

c.   Extracting any data from J.B. Hunt's computer networks and systems and return all data and information previously extracted;

d.   Misappropriating J.B. Hunt's trade secrets, including but not limited to the Higher-

Tier Data and the Bid Data; and

e.   Ordering TruckSmarter to permanently destroy any and all Higher Tier Data, Bid Data, and other trade secrets and confidential information that has been extracted; and

(e)   Such other and further relief as the court may deem to be just and proper.

Respectfully submitted,

Marshall S. Ney (Ark. Bar No. 91108)
Katherine C. Campbell (Ark. Bar No. 2013241)
Friday, Eldredge & Clark, LLP
3350 S. Pinnacle Hills Pkwy, Suite 301
Rogers, AR 72758
Telephone: (479) 695-6049
Facsimile: (501) 244-5389
mney@fridayfirm.com
kcampbell@fridayfirm.com

*Attorneys for Plaintiff*