**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**J.B. HUNT TRANSPORT, INC.**                                         **PLAINTIFF**

**vs.**                          **CASE NO. 5:23-cv-05083**

**TRUCKSMARTER,  INC.**                                         **DEFENDANT**

**TRUCKSMARTER'S ANSWER TO J.B. HUNT'S FIRST AMENDED COMPLAINT**

     Defendant, TruckSmarter, Inc. ("TruckSmarter"), by and through its attorneys, Quattlebaum, Grooms & Tull PLLC and Quinn Emanuel Urquhart & Sullivan, LLP, hereby responds to Plaintiff, J.B. Hunt Transport, Inc.'s ("J.B. Hunt") First Amended Complaint as follows:

## NATURE OF THE DISPUTE

     1.    This action involves TruckSmarter's improper acquisition and use of J.B. Hunt's trade secrets and other confidential information.  TruckSmarter solicited motor carriers with whom J.B. Hunt has contractual relationships ("Carriers") and requested that they share their log-on credentials in violation of their agreements with J.B. Hunt.  TruckSmarter did so in order to access J.B. Hunt's trade secrets and other confidential information to compete with J.B. Hunt and also to leverage that information to advance its other commercial purposes, including its factoring services.  Without J.B. Hunt's authorization, TruckSmarter accessed trade secrets and confidential information on J.B. Hunt's computer systems and servers in violation of state and federal law. TruckSmarter then converted and misappropriated the trade secrets and confidential information for TruckSmarter's commercial benefit.  Despite J.B. Hunt's notice and demand that TruckSmarter cease-and-desist, its wrongful conduct continues and is causing J.B. Hunt irreparable harm.

**ANSWER:**  Paragraph 1 purports to summarize the Amended Complaint's allegations and states legal conclusions and therefore no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 1.

<u>**PARTIES**</u>

2.      Plaintiff J.B. Hunt Transport, Inc. is a corporation organized under the laws of the State of Georgia, having its principal place of business in Lowell, Arkansas.

**ANSWER:**   Upon information and belief, TruckSmarter admits the allegations in paragraph 2 of the Amended Complaint.

3.      Upon information and belief, Defendant TruckSmarter is a corporation organized under the laws of the State of Delaware, having its principal place of business in San Francisco, California.

**ANSWER:**   TruckSmarter admits the allegations in paragraph 3 of the Amended Complaint.

<u>**JURISDICTION  AND VENUE**</u>

4.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and the amount in controversy, exclusive of costs and interest, exceeds $75,000.

**ANSWER:**  Paragraph 4 of the Amended Complaint purports to state a legal conclusion to which no response is required.  To the extent a response is required, while TruckSmarter denies that Plaintiff has stated any claim upon which relief can be granted, including that Plaintiff is entitled to damages, TruckSmarter has not disputed federal court jurisdiction in this action.

5.      Additionally, this Court has original subject matter jurisdiction over Count 3 of this matter pursuant to 28 U.S.C. § 1331 because this claim arises "under the Constitution, laws, or treaties of the United States." Specifically, Plaintiff asserts a violation of the Computer

Fraud and Abuse Act (18 U.S.C. § 1030(g)). The Court may exercise supplemental jurisdiction over Plaintiff's remaining state law claims pursuant to 28 U.S.C. §§ 1367 and 1441(c) because the state claims are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

**ANSWER:** TruckSmarter admits that J.B. Hunt alleges that TruckSmarter violated the Computer Fraud and Abuse Act, but denies that it has violated that statute. The remaining allegations in paragraph 5 of the Amended Complaint purport to state legal conclusions to which no response is required. To the extent a response is required, TruckSmarter denies those remaining allegations.

6.      The Court has personal jurisdiction over TruckSmarter because it has sufficient minimum contacts with the State of Arkansas and has directed its tortious and unlawful activities at the State of Arkansas. TruckSmarter purposefully directed its activities at Arkansas because that is where J.B. Hunt is located, where the trade secrets and other confidential information were maintained, and where J.B. Hunt's computer systems and servers are located. TruckSmarter knew or reasonably could have known that its actions would have an impact in Arkansas.

**ANSWER:** Paragraph 6 of the Amended Complaint purports to state legal conclusions to which no response is required. To the extent a response is required, TruckSmarter denies the allegations in paragraph 6 of the Amended Complaint.

7.      The Court also has personal jurisdiction over TruckSmarter because, as set forth in Paragraphs 60-72 and 152-163 herein, TruckSmarter conspired with carriers located in Arkansas ("Arkansas Carriers"). TruckSmarter entered into agreements with the Arkansas

3

Carriers, and these Arkansas Carriers have sufficient minimum contacts with Arkansas. The Arkansas Carriers' activities in Arkansas were in furtherance of the conspiracy and may be attributed to TruckSmarter. As set forth herein, the conspiracy impacted the forum because the property that is the subject of this action *(i.e.,* the trade secrets and confidential information that were misappropriated and the computer systems and servers that were improperly accessed) are located in Arkansas. As set forth in Paragraph 162 herein, TruckSmarter and the Arkansas Carriers with whom it conspired knew or reasonably could have known that their actions would have an impact in Arkansas.

**ANSWER:** TruckSmarter admits that it entered into agreements with certain carriers who may be based out of Arkansas. The remaining allegations in paragraph 7 of the Amended Complaint purport to state legal conclusions to which no response is required. To the extent a response is required, TruckSmarter denies the remaining allegations in paragraph 7 of the Amended Complaint.

8.     Venue is proper in the Fayetteville Division of the Western District of Arkansas pursuant to 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in Lowell, Arkansas, and "a substantial part of property that is the subject of the action is situated" in Lowell, Arkansas, within the Fayetteville Division of the Western District of Arkansas. Specifically, the confidential information and trade secrets that were misappropriated and converted are maintained on servers located in Lowell, and the computer and computer systems that were improperly accessed are located in Lowell. *See* Ark. Code Ann. § 5- 41-105 (providing that venue is proper in any county in which any computer, computer system, or computer network that is an object or instrument of the violation is located).

4

**ANSWER:** Paragraph 8 of the Amended Complaint purports to state legal conclusions to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 8 of the Amended Complaint.

## FACTUAL ALLEGATIONS

### J.B. Hunt's Carrier 360 Application

9.      A load board is an online marketplace matching shippers and freight brokers with motor carriers available to take their loads. Shippers post the loads that they need moved, and carriers place offers on the loads.  The load is booked to the qualified motor carrier with the best offer within a designated timeframe.

**ANSWER:** TruckSmarter admits the allegations in the first two sentences of paragraph 9 of the Amended Complaint.  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in the third sentence of paragraph 9 of the Amended Complaint and, therefore, denies those allegations.

10.     J.B. Hunt's proprietary Carrier 360 application ("Carrier 360") provides motor carriers with access to a load board designed and maintained by J.B. Hunt.  Carrier 360 allows motor carriers vetted and approved by J.B. Hunt to access, view, place offers on, and book J.B. Hunt loads.

**ANSWER:** TruckSmarter admits that Carrier 360 provides motor carriers with access to a load board.  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 10 of the Amended Complaint and, therefore, denies those allegations.

11.     The more a Carrier uses Carrier 360, the more visibility it receives.  For example, the higher-tier Carriers have visibility into the names of the shippers, the time of pick-ups and drop-offs, and the shipping routes (collectively, **"Higher Tier Data").**

**ANSWER:** TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 11 of the Amended Complaint and, therefore, denies those allegations.

12.     The Higher Tier Data is available only through Carrier 360 to higher-tier Carriers.

**ANSWER:** TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 12 of the Amended Complaint and, therefore, denies those allegations.

13.     Because of J.B. Hunt's size and sophistication, Carrier 360 provides access to more loads and greater visibility into the load details than smaller motor carriers otherwise would be able to access through other load boards.

**ANSWER:** TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 13 of the Amended Complaint, including because J.B. Hunt has not defined "access" to loads, "visibility," or "load details," and, therefore, denies those allegations.

14.     The loads that are available on Carrier 360 are available only through legitimate, permitted access to that platform and nowhere else.

**ANSWER:** TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 14 of the Amended Complaint, including because J.B. Hunt has not defined "legitimate, permitted access," and, therefore, denies those allegations.

15.     The loads available on Carrier 360 can be offered and booked only in Carrier 360.

**ANSWER:** TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 15 of the Amended Complaint and, therefore, denies those allegations.

16.     The Higher-Tier Data is confidential and a trade secret of J.B. Hunt.

**ANSWER:**   TruckSmarter denies the allegations in paragraph 16 of the Amended Complaint.

17.     J.B. Hunt uses the Higher-Tier Data to incentivize Carriers to book with it and to retain the higher-tier Carriers.

**ANSWER:**   TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 17 of the Amended Complaint and, therefore, denies those allegations.

18.     When Carriers place offers on and book loads through Carrier 360, J.B. Hunt acquires and collects valuable data **("Bid Data").**  The Bid Data includes the prices of the offers made on the load and the price for which the load ultimately was booked.

**ANSWER:**   TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 18 of the Amended Complaint and, therefore, denies those allegations.

19.     The Bid Data allows J.B. Hunt to identify the most desirable loads, lanes, times, and shippers so that it can improve its services and tailor loads to certain Carriers.

**ANSWER:**   TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 19 of the Amended Complaint and, therefore, denies those allegations.

20.     The Bid Data allows J.B. Hunt to conduct real-time price optimization.

**ANSWER:**   TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 20 of the Amended Complaint and, therefore, denies those allegations.

21.    The Bid Data is confidential and a trade secret that J.B. Hunt uses for commercial purposes and intends to use for commercial purposes in the future.

**ANSWER:** TruckSmarter lacks knowledge sufficient to form a belief as to how J.B. Hunt intends to use the Bid Data and, therefore, denies those allegations. TruckSmarter denies the remaining allegations in paragraph 21 of the Amended Complaint.

22.    Data available on Carrier 360, including the Higher Tier Data and the Bid Data, is maintained and housed on computer systems and servers located in Lowell, Arkansas.

**ANSWER:** TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 22 of the Amended Complaint and, therefore, denies those allegations.

***J.B. Hunt's Carriers Are Subject to Confidentiality Agreements***

23.    Because the information accessible through Carrier 360 includes proprietary trade secrets and other confidential information, J.B. Hunt takes great strides to protect its information.

**ANSWER:** TruckSmarter denies the allegations in paragraph 23 of the Amended Complaint.

24.    All information accessible through Carrier 360 is password-protected and requires a user log-in.

**ANSWER:** TruckSmarter denies the allegations in paragraph 24 of the Amended Complaint.

25.    In order to obtain a user log-in, a motor carrier must be vetted and approved by J.B. Hunt.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 25 of the Amended Complaint and, therefore, denies those allegations.

26.     As a condition of accessing the information available on Carrier 360, motor carriers must agree to Carrier Terms of Service, inclusive of Terms and Conditions, a true and accurate copy of which is attached hereto as **Exhibit A.**

**ANSWER:**  TruckSmarter lacks knowledge sufficient to form a belief as to whether, "[a]s a condition of accessing the information available on Carrier 360, motor carriers must agree to Carrier Terms of Service" and as to whether the Terms and Condition attached to the Amended Complaint as Exhibit A are "a true and accurate copy" of J.B. Hunt's Terms and Conditions and, therefore, denies those allegations.

27.     For example, the Terms and Conditions include the following provisions: "You agree not to share or disclose Your user identification and/or password unless expressly authorized by J.B. Hunt under emergency business conditions.  You are responsible for maintaining the confidentiality of Your access information and for controlling access to Your Account." **Ex. A** at 2.

**ANSWER:**  Paragraph 27 of the Amended Complaint purports to quote from a document, the contents of which speak for itself and accordingly no response is required.

28.     No one receives access to Carrier 360, including the Higher Tier Data and the Bid Data, without agreeing to these Terms and Conditions.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 28 of the Amended Complaint and, therefore, denies those allegations.

29.     The data available on Carrier 360 is provided and published based on the belief that only J.B. Hunt-vetted and J.B. Hunt-approved Carriers will be able to view it and access it.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 29 of the Amended Complaint and, therefore, denies those allegations.

*TruckSmarter and Its Application*

30.     Founded in April 2021, TruckSmarter purports to offer a free load board to motor carriers nationwide.

**ANSWER:**   TruckSmarter admits the allegations in paragraph 30 of the Amended Complaint, except it denies the allegations in paragraph 30 of the Amended Complaint to the extent that J.B. Hunt's use of the word "purports" is intended to suggest that TruckSmarter does not in fact offer a free load board to motor carriers nationwide.

31.     Upon information and belief, TruckSmarter served approximately 100,000 motor carriers in the United States by the end of 2022.

**ANSWER:**  TruckSmarter admits that it served approximately 150,000 users by the end of 2022.

32.     The TruckSmarter load board is created by aggregating data from other sources and making it available through a centralized application.

**ANSWER:**   TruckSmarter admits paragraph 32 of the Amended Complaint describes a manner by which loads are added to its load board but denies the allegations in paragraph 32 of the Amended Complaint to the extent that it states that TruckSmarter's load board *only* functions in this manner.  Brokers also directly send TruckSmarter loads to add to the board.

10

33.     TruckSmarter's website explains: "Our load board pulls loads from other sources into one location so it is easier for independent owner operators to find loads. Instead of paying for high priced subscriptions or searching for loads in multiple places our goal is to save you time and money by being a single source to search, bid, book, and manage your loads." *See* https://www.trucksmarter.com/load-board (last visited May 15, 2023).

ANSWER:  Paragraph 33 of the Amended Complaint purports to quote from a website, the contents of which speak for itself and accordingly no response is required.

34.     Since 2021, TruckSmarter has raised more than $44 million in capital to build its platform.

ANSWER:  TruckSmarter admits the allegations in Paragraph 34 of the Amended Complaint.

35.     Upon information and belief, TruckSmarter makes its revenue by offering truckers same-day payments for each load through *factoring* services. Motor carriers often must wait up to one month after a load is completed to receive payment.  TruckSmarter takes 1.5% off a load's revenue for loads that it pays the same day.

ANSWER:  TruckSmarter admits paragraph 35 of the Amended Complaint describes a manner by which it earns revenue, but denies the allegations in paragraph 35 of the Amended Complaint to the extent that J.B. Hunt's use of the phrase "TruckSmarter makes its revenue by" is intended to suggest that TruckSmarter *only* earns revenue in this manner and denies that "[m]otor carriers often must wait up to one month after a load is completed to receive payment" when in fact motor carriers must often wait longer than one month after completing a load to receive payment.

11

36.     As a result, the more loads that motor carriers book through the TruckSmarter platform, the more revenue potential TruckSmarter has.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations of paragraph 36 of the Amended Complaint, including because J.B. Hunt has not defined "revenue potential," and, therefore, denies those allegations.

***TruckSmarter's Wrongful Conduct***

37.     As TruckSmarter's own website acknowledges, TruckSmarter obtains its information and loads from other sources.

**ANSWER:**  To the extent paragraph 37 of the Amended Complaint is referring to TruckSmarter's website, TruckSmarter respectfully refers the Court to that website, the contents of which speak for itself.  TruckSmarter admits that it obtains information and loads from other sources, including from brokers directly.

38.     This includes obtaining proprietary trade secrets and other confidential information from Carrier 360 without J.B. Hunt's authorization.

**ANSWER:**  Paragraph 38 purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 38 of the Amended Complaint.

39.     To perpetrate this scheme, TruckSmarter solicits Carriers approved to use Carrier 360 ("J.B. Hunt Carriers").

**ANSWER:**  Paragraph 39 purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 39 of the Amended Complaint.

40.     TruckSmarter then requests that the J.B. Hunt Carriers share their log-on credentials for Carrier 360 as reflected in the screenshot from the TruckSmarter platform below.



ANSWER:  Paragraph 40 of the Amended Complaint purports to excerpt a portion of TruckSmarter's website, the contents of which speak for itself and therefore no response is required.

41.     TruckSmarter's website states, "By connecting your broker accounts to TruckSmarter, you can enable bidding and booking for loads that are posted on the TruckSmarter load board!"   *See*   https://help.trucksmarter.com/hc/en-us/articles/6104730456340-Connecting-broker-accounts (last visited May 15, 2023).  The website explains how to connect broker accounts.  *Id.*  Specifically, the TruckSmarter website

instructs: "At the credentials pane, submit your broker username and password that you use to login with the broker." *Id.*

      **ANSWER:** Paragraph 41 of the Amended Complaint purports to quote from TruckSmarter's website, the contents of which speak for themselves.

      42.    TruckSmarter solicits the J.B. Hunt Carriers and requests their log-on credentials knowing that doing so constitutes a breach of the J.B. Hunt Carriers' agreements with J.B. Hunt.

      **ANSWER:** Paragraph 42 purports to state a legal conclusion to which no response is required. To the extent a response is required, TruckSmarter denies the allegations in paragraph 42 of the Amended Complaint.

      43.    By using the J.B. Hunt Carriers' credentials, TruckSmarter connects to, interfaces with, and accesses Carrier 360.

      **ANSWER:** Paragraph 43 purports to state a legal conclusion to which no response is required. To the extent a response is required, TruckSmarter denies the allegations in paragraph 43 of the Amended Complaint.

      44.    Through this unauthorized access to Carrier 360, TruckSmarter is able to access J.B. Hunt's proprietary trade secrets and other confidential information.

      **ANSWER:** Paragraph 44 purports to state a legal conclusion to which no response is required. To the extent a response is required, TruckSmarter denies the allegations in paragraph 44 of the Amended Complaint.

      45.    By improperly accessing the credentials of one of the J.B. Hunt Carriers in the higher-tier, TruckSmarter is able to obtain the Higher Tier Data.

14

**ANSWER:** Paragraph 45 purports to state a legal conclusion to which no response is required. To the extent a response is required, TruckSmarter denies the allegations in paragraph 45 of the Amended Complaint.

46. It does not stop there. TruckSmarter publishes and shares the information from Carrier 360, including Higher Tier Data, on the TruckSmarter platform.

**ANSWER:** TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of paragraph 46 of the Amended Complaint because TruckSmarter does not know what "It does not stop there," "publishes," and "shares" mean and, therefore, denies those allegations. TruckSmarter lacks knowledge sufficient to admit or deny the allegations in the second sentence of paragraph 46 of the Amended Complaint and, therefore, denies those allegations.

47. TruckSmarter shares this information with motor carriers that have not been vetted or approved by J.B. Hunt and that notably are not subject to confidentiality obligations.

**ANSWER:** TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of paragraph 47 of the Amended Complaint because TruckSmarter does not know which carriers J.B. Hunt vets or how it vets them and, therefore, denies those allegations.

48. By publicly providing information that ordinarily would be accessible only to J.B. Hunt's highest tier Carriers, TruckSmarter is disincentivizing motor carriers from working with J.B. Hunt.

**ANSWER:** TruckSmarter denies the allegations in paragraph 48 of the Amended Complaint.

49. Still, there is more. Not only are J.B. Hunt loads and Higher-Tier data visible on the TruckSmarter platform, but the J.B. Hunt loads also are offered on and booked directly through the TruckSmarter application.

**ANSWER:** TruckSmarter admits the allegations in paragraph 49 of the Amended Complaint, except it denies the allegations in the first sentence of paragraph 49 of the Amended Complaint as TruckSmarter does not know what "Still, there is more" means.

50.     By using the J.B. Hunt Carriers' credentials, TruckSmarter gains full functionality on Carrier 360.  This allows a user of the Truck Smarter platform to place offers on and book J.B. Hunt loads directly through the TruckSmarter platform.

**ANSWER:** TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of paragraph 50 of the Amended Complaint and, therefore, denies those allegations. TruckSmarter admits that its users may place offers on and book loads available on Carrier 360 through the TruckSmarter platform.

51.     If a J.B. Hunt load is offered on or booked through the TruckSmarter application, J.B. Hunt does not have visibility into the Bid Data for that load.

**ANSWER:** TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of paragraph 51 of the Amended Complaint and, therefore, denies those allegations.

52.     Additionally, for any J.B. Hunt Carrier that provides its Carrier 360 log-on credentials to TruckSmarter, TruckSmarter can view that Carrier's historical Bid Data.

**ANSWER:** TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of paragraph 52 of the Amended Complaint because J.B. Hunt has not defined "historical Bid Data," and, therefore, denies those allegations.

53.     TruckSmarter has admitted that it not only is accessing J.B. Hunt's Higher-Tier Data and Bid Data, but it also is extracting that data.

**ANSWER:** TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of paragraph 53 of the Amended Complaint, including because J.B. Hunt has not explained

the difference between "accessing" and "extracting" and, therefore, denies those allegations. TruckSmarter admits that it has accessed certain J.B. Hunt data.

54.    In July 2022, TruckSmarter CEO wrote to J.B. Hunt, "While we do not believe we are doing anything wrong with how we access data today, we can pause extractions leading up to a scheduled meeting so we can have a conversation in good faith."

**ANSWER:**  Paragraph 54 of the Amended Complaint purports to quote from a document, the contents of which speak for itself and accordingly no response is required.

55.    Notably, at that time, TruckSmarter agreed to pause extracting data, but it did not agree to stop accessing data.  At this time, J.B. Hunt has not been able to determine whether extractions have resumed, but TruckSmarter remains in a position to extract such data, including Higher-Tier Data, at any time.

**ANSWER:**  TruckSmarter admits the allegations in the first sentence of Paragraph 55, except it rejects any characterization of those allegations as "[n]otabl[e]."  TruckSmarter lacks knowledge sufficient to admit or deny the remaining allegations in paragraph 55 of the Amended Complaint and, therefore, denies those allegations.

56.    TruckSmarter is capturing and extracting the Higher-Tier Data and Bid Data for its own competitive advantage.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of paragraph 56 of the Amended Complaint because J.B. Hunt has not defined "competitive advantage" and, therefore, denies those allegations.

57.    TruckSmarter's own Terms of Service confirm its knowledge that its conduct is improper.

**ANSWER:** TruckSmarter denies the allegations in paragraph 57 of the Amended Complaint.

58. TruckSmarter's Terms of Service, attached hereto as **Exhibit B**, expressly acknowledge that the information provided on the TruckSmarter platform is protected. "The visual interfaces, graphics, design, compilation, information, data, computer code (including source code or object code), products, software, services, and all other elements of the Service ("Materials") provided by TruckSmarter are protected by intellectual property and other laws. All Materials included in the Service are the property of TruckSmarter or its third-party licensors. Except as expressly authorized by TruckSmarter, you may not make use of the Materials. TruckSmarter reserves all rights to the Materials not granted expressly in these Terms." Ex. B, § 6.

**ANSWER:** Paragraph 58 of the Amended Complaint purports to quote from a document, the contents of which speak for themselves.

59. TruckSmarter likewise takes steps to protect the information on its platform through password protection. *Id., §* 3.

**ANSWER:** Paragraph 59 of the Amended Complaint purports to summarize a portion of a document, the contents of which speak for themselves.

*TruckSmarter Induces Arkansas-Based Carriers To Breach Their Agreements with J.B. Hunt*

60. When Carriers sign up with TruckSmarter, they are invited to share their Carrier 360 credentials.

**ANSWER:** TruckSmarter admits the allegations in paragraph 60 of the Amended Complaint.

61.     J.B. Hunt estimates that more than 100 J.B. Hunt Carriers have shared their log-on credentials with TruckSmarter.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to admit or deny the allegations in paragraph 61 of the Amended Complaint, specifically what "J.B. Hunt estimates" and which carriers are "J.B. Hunt Carriers" and, therefore, denies those allegations.

62.     J.B. Hunt has confirmed that at least two of its Arkansas-based Carriers have at one time been TruckSmarter users and have shared their log-on credentials with TruckSmarter.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to admit or deny the allegations in paragraph 62 of the Amended Complaint, specifically what "J.B. Hunt has confirmed" and, therefore, denies those allegations.

63.     For example, Trejo's Transport, LLC currently is a J.B. Hunt Carrier organized under the laws of the State of Arkansas with its principal place of business in Farmington, Arkansas.

**ANSWER:**  Upon information and belief, TruckSmarter admits that Trejo's Transport, LLC is organized under the laws of the State of Arkansas. TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of other allegations in paragraph 63 of the Amended Complaint and, therefore, denies those allegations.

64.     J.B. Hunt has confirmed that Trejo's Transport, LLC is a TruckSmarter carrier and has shared its J.B. Hunt log-on credentials with TruckSmarter.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of what "J.B. Hunt has confirmed" and, therefore, denies those allegations.  TruckSmarter

admits that Trejo's Transport, LLC has an account with TruckSmarter that it connected with J.B. Hunt.

65.     In addition, TruckSmarter's website features Paye Logistics LLC from Little Rock, Arkansas as one of its testimonials.   An image of TruckSmarter's website is included below:



"In a ever changing industry where rates are not only based on truck to load ratio, but also on the competition rates for the same lane, you have to see everything. Just use TruckSmarter 🤎."

EMMANUEL P.
Paye Logistics LLC — Little Rock, AR

**ANSWER:**   Paragraph 65 purports to excerpt a portion of TruckSmarter's website, the contents of which speak for itself and therefore no response is required.

66.     Paye Logistics is a registered motor carrier organized under the laws of the State of Arkansas with its principal place of business in Little Rock, Arkansas.

**ANSWER:**   Upon information and belief, TruckSmarter admits that Paye Logistics, LLC is a carrier and is organized under the laws of the State of Arkansas but TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of Paye Logistics, LLC's principal place of business and, therefore, denies those allegations.

67.     Paye Logistics, LLC was a J.B. Hunt-approved Carrier until March 22, 2022. Upon information and belief, Paye Logistics, LLC was a client of TruckSmarter prior to March 22, 2022.

**ANSWER:** TruckSmarter admits the allegations in paragraph 67 of the Amended Complaint.

68.     TruckSmarter solicited J.B. Hunt Carriers, which includes the Arkansas Carriers.

**ANSWER:** Paragraph 68 of the Amended Complaint purports to state a legal conclusion to which no response is required.   To the extent a response is required, TruckSmarter lacks knowledge sufficient to admit or deny the allegations, specifically which carriers are "J.B. Hunt Carriers" or "Arkansas Carriers" and, therefore, denies those allegations.

69.     TruckSmarter requested that J.B. Hunt Carriers, including the Arkansas Carriers, provide their log-on credentials for Carrier 360.

**ANSWER:** TruckSmarter lacks knowledge sufficient to admit or deny the allegations, specifically because J.B. Hunt has not defined "requested" and because TruckSmarter does not know which carriers are "J.B. Hunt Carriers" or "Arkansas Carriers" and, therefore, denies those allegations.

70.     By downloading, installing, accessing, or using the TruckSmarter application, the J.B. Hunt Carriers, including those in Arkansas, enter into an agreement with TruckSmarter. Ex. B, § 1-2.

**ANSWER:** TruckSmarter admits that carriers that download, install, access, or use the TruckSmarter application enter into an agreement with TruckSmarter.   Paragraph 70 of the Amended Complaint also cites to a document, the contents of which speak for itself.

71.     The J.B. Hunt Carriers, including the Arkansas Carriers, provide their Carrier 360 log-on credentials in furtherance of this agreement.

**ANSWER:**  TruckSmarter admits that some carriers have provided it with their Carrier 360 log-on credentials, including some carriers who may be based out of Arkansas.  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 71 of the Amended Complaint, including because J.B. Hunt has not defined "in furtherance of" and because TruckSmarter does not know which carriers are "J.B. Hunt Carriers" and, therefore, denies those allegations.

72.    The Arkansas Carriers undertake activities in furtherance of the agreement from Arkansas, including providing their log-on credentials and accessing and using the TruckSmarter platform.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 72 of the Amended Complaint and, therefore, denies those allegations.

***J.B. Hunt Has Expended Time and Resources Investigating the Harm Caused by TruckSmarter and Taking Remedial Measures***

73.    Since discovering TruckSmarter's scheme, J.B. Hunt has been diligent in conducting a full investigation into the facts.

**ANSWER:**  To the extent that Paragraph 73 purports to state a legal conclusion, no response is required.  To the extent a response is required, TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 73 of the Amended Complaint and, therefore, denies those allegations.

74.    J.B. Hunt has taken steps to determine the extent of TruckSmarter's unauthorized access, to investigate the harm caused by such unauthorized access, and to take the necessary and appropriate remedial measures.  These efforts include, without limitation, fact-gathering, engaging in conversations with TruckSmarter on this issue since June 2022, and attempting to prevent

further unauthorized access. These efforts include, without limitation, many hours of valuable time of J.B. Hunt's employees away from their day-to-day responsibilities.

**ANSWER:**  Paragraph 74 of the Amended Complaint purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations and, therefore, denies those allegations.

75.    J.B. Hunt's application security team has spent more than ten hours researching solutions to prevent TruckSmarter from accessing J.B. Hunt's trade secrets and other data and developing implementation strategies.

**ANSWER:**  To the extent that Paragraph 75 of the Amended Complaint purports to state a legal conclusion, no response is required.  To the extent a response is required, TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 75 of the Amended Complaint and, therefore, denies those allegations.

76.    J.B. Hunt's networking team has spent more than 10 hours identifying TruckSmarter's conduct and blocking IP ranges.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 76 of the Amended Complaint and, therefore, denies those allegations.

77.    J.B. Hunt's application development team has spent more than 450 hours identifying and documenting TruckSmarter's conduct, researching potential solutions to prevent TruckSmarter's unauthorized access, preventing TruckSmarter's access, and switching systems and migrating data to attempt to prevent further unauthorized access.

23

**ANSWER:**  TruckSmarter denies allegations of "unauthorized access" in paragraph 77 of the amended complaint.  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of other allegations in paragraph 77 of the Amended Complaint and, therefore, denies those allegations.

78.     J.B. Hunt's infrastructure team has spent more than 10 hours identifying and documenting the data that is being accessed without authorization.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of allegations in paragraph 78 of the Amended Complaint and, therefore, denies those allegations, except that it specifically denies any allegations that TruckSmarter accessed data without authorization.

79.     Other key engineering personnel at J.B. Hunt have spent at least 100 hours directing and coordinating these efforts.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 79 of the Amended Complaint and, therefore, denies those allegations.

80.     A conservative estimate of these employees' time is approximately $60,000.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 80 of the Amended Complaint and, therefore, denies those allegations.

81.     These efforts are ongoing, and these costs continue to accumulate.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 81 of the Amended Complaint and, therefore, denies those allegations.

***J.B. Hunt's Good Faith Attempts To Resolve This Dispute Have Failed***

82.     J.B. Hunt put TruckSmarter on notice that its scheme violates J.B. Hunt's Carrier Terms and Condition and sent TruckSmarter a copy of the Carrier Terms and Conditions.

**ANSWER:**  Paragraph 82 of the Amended Complaint purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 82.  TruckSmarter admits that J.B. Hunt contacted it and sent it documents.

83.     TruckSmarter representatives participated in a call to discuss its conduct with J.B. Hunt representatives about a month later.

**ANSWER:**  TruckSmarter admits that J.B. Hunt and TruckSmarter representatives have spoken over the phone.  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 83 of the Amended Complaint, including because it is unclear what date "about a month later" refers to, and, therefore, denies those allegations.

84.     During these discussions, TruckSmarter did not deny the conduct described above and admitted TruckSmarter is extracting and capturing the Bid Data.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 84 of the Amended Complaint, including because J.B. Hunt has not defined "extracting and capturing the Bid Data," and, therefore, denies those allegations.

85.     TruckSmarter has rejected requests to cease-and-desist its wrongful conduct and continues its wrongful conduct to present day.

**ANSWER:**  Paragraph 85 of the Amended Complaint purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 85.

## FIRST CLAIM FOR RELIEF

### (Tortious Interference with Contracts)

86.   J.B. Hunt adopts and fully incorporates the foregoing paragraphs of this Complaint as if set forth herein word for word.

**ANSWER:**  TruckSmarter incorporates by reference its responses to the foregoing paragraphs above as if fully set forth herein.

87.   J.B. Hunt Carriers agree to be bound by the Carrier Terms and Conditions in order to access, view, place offers on, and book J.B. Hunt loads.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 87 of the Amended Complaint and, therefore, denies those allegations.

88.   The Terms and Conditions are valid contracts.

**ANSWER:**  Paragraph 88 of the Amended Complaint purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 88 and, therefore, denies those allegations.

89.   Through these Terms and Conditions, J.B. Hunt maintains valid contractual relationships and business expectancies with the J.B. Hunt Carriers.

**ANSWER:**  Paragraph 89 of the Amended Complaint purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter lacks

knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 89 and, therefore, denies those allegations.

90.     As part of these contractual relationships, the J.B. Hunt Carriers are prohibited from sharing their log-on credentials.

**ANSWER:** "These contractual relationships" purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 90 of the Amended Complaint and, therefore, denies those allegations.

91.     J.B. Hunt had a reasonable expectation that the J.B. Hunt Carriers would continue to honor their obligations under the Terms and Conditions.

**ANSWER:**  Paragraph 91 of the Amended Complaint purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 91 and, therefore, denies those allegations.

92.     J.B. Hunt similarly had a reasonable expectation in continuing to do business with the J.B. Hunt Carriers.

**ANSWER:**  Paragraph 92 of the Amended Complaint purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 92 and, therefore, denies those allegations.

93.     Since at least June 2022, TruckSmarter has had knowledge of the contractual relationship and business expectancy between J.B. Hunt and the J.B. Hunt Carriers, including the prohibition on sharing log-on credentials.

**ANSWER:** Paragraph 93 of the Amended Complaint purports to state a legal conclusion to which no response is required. To the extent a response is required, TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 93 and, therefore, denies those allegations. TruckSmarter admits that J.B. Hunt has signed contracts with certain carriers.

94. TruckSmarter has intentionally interfered with J.B. Hunt's contractual relationships with its Carriers and has caused the J.B. Hunt Carriers to breach the Carrier Terms and Conditions by (a) soliciting the J.B. Hunt Carriers; (b) requesting J.B. Hunt's Carriers' log-on credentials; and (c) causing J.B. Hunt's Carriers to share their log-on credentials.

**ANSWER:** Paragraph 94 of the Amended Complaint purports to state a legal conclusion to which no response is required. To the extent a response is required, TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 94 and, therefore, denies those allegations, except TruckSmarter admits that some carriers have provided it with their J.B. Hunt log-on credentials.

95. TruckSmarter also has intentionally interfered with J.B. Hunt's business expectancy with its Carriers by moving the offer and booking activity from Carrier 360 to the TruckSmarter platform.

**ANSWER:** Paragraph 95 of the Amended Complaint purports to state a legal conclusion to which no response is required. To the extent a response is required, TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 95 and, therefore, denies those allegations, except TruckSmarter admits that its users may place offers on and book loads available on Carrier 360 through the TruckSmarter platform.

96. The conduct of TruckSmarter as set forth herein was intentional and improper.

**ANSWER:** Paragraph 96 of the Amended Complaint purports to state legal conclusions to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 96 of the Amended Complaint.

97.    As a result of TruckSmarter's actions, J.B. Hunt Carriers have breached the Terms and Conditions.

**ANSWER:** Paragraph 97 of the Amended Complaint purports to state legal conclusions to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 97 of the Amended Complaint.

98.    As a result of TruckSmarter's actions, J.B. Hunt Carriers have placed offers on and booked J.B. Hunt loads on the TruckSmarter platform that they and others would have placed offers on and booked through Carrier 360 but for TruckSmarter's wrongful conduct.

**ANSWER:** Paragraph 98 of the Amended Complaint purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 98 and, therefore, denies those allegations, except (1) TruckSmarter admits that its users may place offers on and book loads available on Carrier 360 through the TruckSmarter platform; and (2) TruckSmarter denies that its conduct was "wrongful."

99.    J.B. Hunt has been proximately harmed by TruckSmarter's wrongful conduct and tortious interference, including by suffering damages in an amount to be determined by the jury.

**ANSWER:** Paragraph 99 of the Amended Complaint purports to state legal conclusions to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 99 of the Amended Complaint.

100.   J.B. Hunt's damages include, but are not limited to, lost profits from losing loads that it otherwise would have booked but for TruckSmarter improper interference, losing access to the Bid Data that it otherwise would have had but for TruckSmarter improper interference, and damages suffered as a result of the Higher Tier Data being shared publicly.

**ANSWER:**  Paragraph 100 of the Amended Complaint purports to state a legal conclusion to which no response is required.   To the extent a response is required, TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 100 and, therefore, denies those allegations, except TruckSmarter denies that it engaged in any "improper interference."

101.   TruckSmarter's conduct was improper, including but not limited to the following reasons:

a.      TruckSmarter caused J.B. Hunt Carriers to breach the Terms and Condition so that TruckSmarter could acquire unauthorized access to J.B. Hunt's trade secrets and other confidential information;

b.      TruckSmarter caused J.B. Hunt Carriers to breach the Terms and Condition so that TruckSmarter could gain an unfair commercial advantage over J.B. Hunt;

c.      TruckSmarter caused J.B. Hunt Carriers to breach the Terms and Condition so that TruckSmarter could wrongfully acquire trade secrets that J.B. Hunt has spent years acquiring and protecting;

d.      TruckSmarter caused J.B. Hunt Carriers to breach the Terms and Condition to suppress fair competition; and

e.    TruckSmarter caused J.B. Hunt Carriers to breach the Terms and

Condition to access J.B. Hunt's trade secrets and other confidential

information in order to compete with J.B. Hunt.

**ANSWER:**  Paragraph 101 of the Amended Complaint purports to state legal

conclusions to which no response is required.  To the extent a response is required, TruckSmarter

denies the allegations in paragraph 101 of the Amended Complaint.

<u>**SECOND CLAIM FOR RELIEF**</u>

**(Computer Trespass under Ark. Code Ann.§ 5-41-104)**

102.    J.B. Hunt adopts and fully incorporates the foregoing paragraphs of this

Complaint as if set forth herein word for word.

**ANSWER:**    TruckSmarter incorporates by reference its responses to the foregoing

paragraphs above as if fully set forth herein.

103.    TruckSmarter intentionally and without authorization accessed    J.B.

Hunt's computer, computer system, computer network, computer program, or data in violation

of Ark. Code Ann.§ 5-41-104.

**ANSWER:**  Paragraph 103 of the Amended Complaint purports to state legal conclusions

to which no response is required.  To the extent a response is required, TruckSmarter denies the

allegations in paragraph 103 of the Amended Complaint.

104.    As alleged in the Complaint, through intentional and unauthorized access,

TruckSmarter accessed J.B. Hunt's confidential information and trade secrets without J.B.

Hunt's knowledge or consent.

**ANSWER:**  Paragraph 104 of the Amended Complaint purports to state legal conclusions

to which no response is required.  To the extent a response is required, TruckSmarter denies the

allegations in paragraph 104 of the Amended Complaint.

105.    Further, as alleged herein, TruckSmarter intentionally and without authorization extracted data from J.B. Hunt's computer networks or systems.

**ANSWER:**  Paragraph 105 of the Amended Complaint purports to state legal conclusions to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 105 of the Amended Complaint.

106.    J.B. Hunt Carriers permitted TruckSmarter to access J.B. Hunt's trade secrets and other confidential information without J.B. Hunt's knowledge, consent, or participation.

**ANSWER:**  TruckSmarter denies the allegations in paragraph 106 of the Amended Complaint.

107.    TruckSmarter knew that J.B. Hunt did not know about and had not consented to such access or extraction, yet TruckSmarter carried on with its scheme.

**ANSWER:**  TruckSmarter denies the allegations in paragraph 107 of the Amended Complaint.

108.    TruckSmarter has continued to access J.B. Hunt's computer, computer system, computer network, computer program, computer server, or data even after being put on notice that J.B. Hunt does not consent to such conduct.

**ANSWER:**  Paragraph 108 of the Amended Complaint purports to state legal conclusions to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 108 of the Amended Complaint.

109.    Arkansas Code Annotated § 5-41-106 provides J.B. Hunt the legal vehicle to recover civil damages from TruckSmarter for their criminal acts, including but not limited to actual damages, costs of suit, and lost profits.

**ANSWER:** Paragraph 109 of the Amended Complaint purports to state legal conclusions to which no response is required. To the extent a response is required, TruckSmarter denies the allegations in paragraph 109 of the Amended Complaint.

110. As a direct and proximate result of TruckSmarter's foregoing acts, J.B. Hunt has been damaged and has suffered and will continue to suffer immediate and irreparable injury. J.B. Hunt is informed and believes that unless said conduct is enjoined by this Court, TruckSmarter will continue those activities and continue to irreparably harm J.B. Hunt.

**ANSWER:** Paragraph 110 of the Amended Complaint purports to state legal conclusions to which no response is required. To the extent a response is required, TruckSmarter denies the allegations in the first sentence of paragraph 110 of the Amended Complaint. TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in the second sentence of paragraph 110 of the Amended Complaint, including what J.B. Hunt is informed and believes and, therefore, denies those allegations.

111. This injury includes damages that would be hard to quantify, as well as harm to J.B. Hunt's goodwill and reputation that damages cannot remedy. As such, J.B. Hunt has no adequate remedy at law.

**ANSWER:** Paragraph 111 of the Amended Complaint purports to state legal conclusions to which no response is required. To the extent a response is required, TruckSmarter denies the allegations in paragraph 111 of the Amended Complaint.

112. Arkansas Code Annotated § 5-41-106 permits this Court to take any action that helps "to protect the secrecy and security of the computer, computer system, computer network, computer program, computer software, and data involved in order to prevent possible

reoccurrence of the same or a similar act by another person and to protect any trade secret of any party."

**ANSWER:**   Paragraph 112 of the Amended Complaint purports to quote from the Arkansas Code, the contents of which speak for itself and accordingly no response is required.

113.    J.B. Hunt therefore requests that this Court order TruckSmarter to cease-and-desist from accessing or extracting any data from J.B. Hunt's computer networks and systems in any form or fashion whatsoever and to turn over all data and information previously extracted from J.B. Hunt.

**ANSWER:**   Paragraph 113 of the Amended Complaint sets forth a statement of relief requested by J.B. Hunt to which no response is required.  TruckSmarter denies that J.B. Hunt is entitled to any of the requested relief and denies all allegations.

## THIRD CLAIM FOR RELIEF

### (Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g))

114.    J.B. Hunt adopts and fully incorporates the foregoing paragraphs of this Complaint as if set forth herein word for word.

**ANSWER:**   TruckSmarter incorporates by reference its responses to the foregoing paragraphs above as if fully set forth herein.

115.    The J.B. Hunt computer systems to which TruckSmarter gained access constitute computers within the meaning of the Computer Fraud and Abuse Act (CFAA) because they store electronic data.

**ANSWER:**  Paragraph 115 of the Amended Complaint purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 115.

116.   The J.B. Hunt computer systems to which TruckSmarter gained access constitute protected computers within the meaning of the CFAA because they are used in or affecting interstate or foreign commerce or communication.

**ANSWER:**  Paragraph 116 of the Amended Complaint purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 116.

117.   TruckSmarter intentionally accessed J.B. Hunt's computer systems.

**ANSWER:**  Paragraph 117 of the Amended Complaint purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 117.

118.   TruckSmarter accessed J.B. Hunt's computer systems without authorization, namely by inducing J.B. Hunt Carriers to share their log-on credentials in breach of the Carrier Terms and Conditions.

**ANSWER:**  TruckSmarter admits that some carriers have provided TruckSmarter with their Carrier 360 log-on credentials.  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations of paragraph 118 of the Amended Complaint and, therefore, denies those allegations, except that it specifically denies any allegations that TruckSmarter accessed data without authorization.

119.   Alternatively, TruckSmarter's access exceeded its authorization because the computer systems were accessed to obtain and/or to use information from J.B. Hunt's protected computers, namely trade secrets belonging to J.B. Hunt in competition with J.B. Hunt.

**ANSWER:**  TruckSmarter denies the allegations in paragraph 119 of the Amended Complaint.

120.   TruckSmarter intentionally and without authorization accessed J.B. Hunt's computer systems in order to obtain information from the protected computers, namely trade secrets and other confidential information belonging to J.B. Hunt.

**ANSWER:**  Paragraph 120 purports to state a legal conclusion to which no response is required.  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations of paragraph 120 of the Amended Complaint, including because J.B. Hunt has not defined what constitutes their "computer system" as opposed to their "protected computers" and, therefore, denies those allegations.

121.   As a result of TruckSmarter's conduct, J.B. Hunt has suffered financial loss in an amount greater than $5,000.00 and other losses in responding to TruckSmarter's unauthorized access, determining the extent of TruckSmarter' s unauthorized access, investigating the harm caused by such unauthorized access, and taking necessary and appropriate remedial measures including attempting to prevent further unauthorized access.

**ANSWER:**  Paragraph 121 purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of other allegations in paragraph 121 of the Amended Complaint and, therefore, denies those allegations.

122.   Thus, TruckSmarter's unauthorized access has caused J.B. Hunt, and will continue to cause J.B. Hunt, to lose in excess of $5,000 during any one-year period.

**ANSWER:** Paragraph 122 purports to state a legal conclusion to which no response is required. TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 122 of the Amended Complaint and, therefore, denies those allegations.

123.    As such, J.B. Hunt may maintain a private right of action for TruckSmarter's violation of the CFAA. *See* 18 U.S.C. § 1030(g).

**ANSWER:** Paragraph 123 of the Amended Complaint purports to state a legal conclusion to which no response is required. To the extent a response is required, TruckSmarter denies the allegations in paragraph 123.

124.    J.B. Hunt has suffered and will continue to suffer damages and losses in an amount to be determined at trial which are ongoing and unabated at the time of filing this Complaint.

**ANSWER:** TruckSmarter denies the allegations in paragraph 124 of the Amended Complaint.

## FOURTH CLAIM FOR RELIEF

### (Conversion)

125.    J.B. Hunt adopts and fully incorporates the foregoing paragraphs of this Complaint as if set forth herein word for word.

**ANSWER:** TruckSmarter incorporates by reference its responses to the foregoing paragraphs above as if fully set forth herein.

126.    J.B. Hunt is entitled to exclusively possess the data and information housed on its computer systems and servers.

**ANSWER:** Paragraph 126 purports to state a legal conclusion to which no response is required. To the extent a response is required, TruckSmarter denies the allegations in paragraph 126 of the Amended Complaint.

127.   J.B. Hunt is entitled to exclusively possess the Bid Data.

**ANSWER:** Paragraph 127 purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 127 of the Amended Complaint.

128.   J.B. Hunt is entitled to exclusively possess the Higher Tier Data.

**ANSWER:** Paragraph 128 purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 128 of the Amended Complaint.

129.   TruckSmarter intentionally and purposely exercised dominion or control over data on J.B. Hunt's computer systems, servers, Bid Data, and Higher Tier Data.

**ANSWER:** Paragraph 129 purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 129 of the Amended Complaint.

130.   Indeed, TruckSmarter's CEO admitted that TruckSmarter was "extract[ing]" data from J.B. Hunt.

**ANSWER:** Paragraph 130 of the Amended Complaint purports to quote from a document, the contents of which speak for itself.  TruckSmarter denies the quote is an admission of any allegation.

131.   TruckSmarter continues to exercise dominion and control over this data.

**ANSWER:** Paragraph 131 purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 131 of the Amended Complaint.

132.    Specifically, J.B. Hunt has a vast network of carriers who place offers on and book loads through Carrier 360.  Carrier 360 contains the Higher-Tier Data.  Carrier 360 also captures the Bid Data.

**ANSWER:**  TruckSmarter admits J.B. Hunt works with carriers who place offers on and book loads through Carrier 360.  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of all other allegations in paragraph 132 of the Amended Complaint and, therefore, denies those allegations.

133.    TruckSmarter solicited J.B. Hunt Carriers and requested that they share their log-on credentials in breach of the Carrier Terms and Conditions.

**ANSWER:**  Paragraph 133 purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 133 of the Amended Complaint.

134.    Once the log-on credentials were shared, TruckSmarter obtained access to the Higher-Tier Data and the historical Bid Data for the carrier that provided its credentials.

**ANSWER:**   TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 134 of the Amended Complaint, including because J.B. Hunt has not defined "obtained access" or what constitutes "historical" Bid Data and, therefore, denies those allegations.

135.    As a result, J.B. Hunt loses exclusive access to the Higher-Tier Data and the historical Bid Data over which it otherwise would have had exclusive dominion and control but for TruckSmarter's wrongful conduct.

**ANSWER:**  Paragraph 135 purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 135 of the Amended Complaint.

136.    Further, all loads offered on and booked through the TruckSmarter application by an approved-J.B. Hunt Carrier are no longer visible to J.B. Hunt.  As a result, J.B. Hunt loses access to Bid Data over which it otherwise would have had exclusive dominion and control but for TruckSmarter's wrongful conduct.

**ANSWER:**  Paragraph 136 purports to state a legal conclusion to which no response is required.  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations of paragraph 136 of the Amended Complaint and, therefore, denies those allegations.

137.    J.B. Hunt has been proximately harmed by TruckSmarter's wrongful conduct in any amount to be proven at trial.

**ANSWER:**  Paragraph 137 of the Amended Complaint purports to state legal conclusions to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 137 of the Amended Complaint.

### FIFTH CLAIM FOR RELIEF

### (Violation of the Arkansas Trade Secrets Act)

138.    J.B. Hunt adopts and fully incorporates the foregoing paragraphs of this Complaint as if set forth herein word for word.

**ANSWER:**  TruckSmarter incorporates by reference its responses to the foregoing paragraphs above as if fully set forth herein.

139.    The Higher Tier Data constitutes a trade secret within the meaning of the Arkansas Trade Secrets Act.  The Higher Tier Data is a compilation of information about loads

40

that would not be readily ascertainable by proper means, including without limitation the name of the shipper, the pick-up and drop-off times, and the shipping routes.

**ANSWER:**  Paragraph 139 purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 139 of the Amended Complaint.

140.    J.B. Hunt's Bid Data constitutes a trade secret within the meaning of the Arkansas Trade Secrets Act.  The Bid Data is a compilation of information about loads that would not be readily ascertainable by proper means, including without limitation the offers made on loads and the transactional price of the booked loads.

**ANSWER:**  Paragraph 140 purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 140 of the Amended Complaint.

141.    The Higher Tier Data and Bid Data derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who could obtain an economic advantage from its disclosure or use.  TruckSmarter's actions in this case confirm that the Higher Tier Data and Bid Data have value. If the information did not have independent economic value or could be readily ascertained by other proper means, then there would have been no reason for TruckSmarter to extract it from J.B. Hunt for its own later competitive use.

**ANSWER:**  Paragraph 141 purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 141 of the Amended Complaint.

142.    The Higher Tier Data incentivizes motor carriers to work with J.B. Hunt and allows J.B. Hunt to attract and retain the highest quality motor carriers.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations of paragraph 142 of the Amended Complaint and, therefore, denies those allegations.

143.    The Bid Data allows J.B. Hunt to determine the most desired loads, lanes, and times; to set competitive pricing in real time; to conduct price optimization; and to customize marketing to motor carriers.

**ANSWER:**  TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations of paragraph 143 of the Amended Complaint and, therefore, denies those allegations.

144.    The Higher Tier Data and Bid Data are, and at all relevant times have been, the subject of J.B. Hunt's reasonable efforts in the circumstances to maintain their secrecy.  The information is maintained on a password-protected system and access is granted only to vetted and approved J.B. Hunt Carriers.  The Carrier Terms and Conditions contain a provision protecting the information from disclosure stating: "You agree not to share or disclose Your user identification and/or password unless expressly authorized by J.B. Hunt under emergency business conditions. You are responsible for maintaining the confidentiality of Your access information and for controlling access to Your Account." Ex. A at 2.

**ANSWER:**  TruckSmarter denies the allegations made in the first sentence of paragraph 144 of the Amended Complaint.  Paragraph 144 also purports to quote from a document, the contents of which speak for itself and accordingly no response is required.  TruckSmarter lacks

knowledge sufficient to form a belief as to the truth or falsity of the other allegations in paragraph 144 and, therefore, denies those allegations.

145.    TruckSmarter disclosed and used these trade secrets without consent and acquired it from J.B. Hunt Carriers who were under an obligation to maintain its secrecy.

**ANSWER:**  TruckSmarter denies the allegations in paragraph 145 of the Amended Complaint.

146.    TruckSmarter misappropriated J.B. Hunt's trade secrets in violation of the Arkansas Trade Secrets Act (a) by acquiring the Higher Tier Data and Bid Data while knowing or having reason to know that the Higher Tier Data and Bid Data were acquired by improper means and (b) by using the Higher Tier Data and Bid Data without authorization after the trade secrets were acquired through improper means.

**ANSWER:**  TruckSmarter denies the allegations in paragraph 146 of the Amended Complaint.

147.    TruckSmarter's conduct was improper within the meaning of the ATSA because it involved conversion, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, and tortious interference with J.B. Hunt's contractual commitments regarding confidentiality.

**ANSWER:**  Paragraph 147 of the Amended Complaint purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 147.

148.    The timing and frequency of TruckSmarter's conduct demonstrate that the conduct was willful and malicious.

**ANSWER:** Paragraph 148 of the Amended Complaint purports to state a legal conclusion to which no response is required. To the extent a response is required, TruckSmarter denies the allegations in paragraph 148.

149. As a result of TruckSmarter's conduct to date, J.B. Hunt has suffered actual loss, including damages in the value and future value of the trade secrets that have been misappropriated, lost goodwill, lost profits, and incurred attorneys' fees.

**ANSWER:** TruckSmarter denies the allegations in paragraph 149 of the Amended Complaint.

150. As a direct and proximate result of TruckSmarter's threatened future misappropriation, J.B. Hunt will continue to suffer immediate and irreparable injury. J.B. Hunt is informed and believes that unless said conduct is enjoined by this Court, TruckSmarter will continue those activities and continue to irreparably harm J.B. Hunt. This injury includes damages that would be hard to quantify, as well as harm to J.B. Hunt's goodwill and reputation that damages cannot remedy. As such, J.B. Hunt has no adequate remedy at law.

**ANSWER:** TruckSmarter denies the allegations in paragraph 150 of the Amended Complaint.

151. Pursuant to Arkansas Code Annotated § 4-75-604, J.B. Hunt also seeks injunctive relief related to TruckSmarter's threatened misappropriation of J.B. Hunt's trade secrets.

**ANSWER:** TruckSmarter denies the allegations in paragraph 151 of the Amended Complaint.

## SIXTH CLAIM FOR RELIEF

### (Civil Conspiracy)

152.   J.B. Hunt adopts and fully incorporates the foregoing paragraphs of this Complaint as if set forth herein word for word.

**ANSWER:**   TruckSmarter incorporates by reference its responses to the foregoing paragraphs above as if fully set forth herein.

153.   TruckSmarter entered into an agreement with J.B. Hunt's Carriers to accomplish a purpose that is unlawful or oppressive or to accomplish, by unlawful or oppressive means, a purpose that is not in itself unlawful or oppressive (the "Conspiracy").

**ANSWER:**   TruckSmarter admits that it entered into agreements with certain carriers that also have agreements with J.B. Hunt.  TruckSmarter denies the other allegations in paragraph 153 of the Amended Complaint.

154.   By downloading, installing, accessing, or using the TruckSmarter application, the J.B. Hunt Carriers entered into an agreement with TruckSmarter. See Ex. Bat 1-2.

**ANSWER:**   TruckSmarter admits the allegations in paragraph 154 of the Amended Complaint.

155.   The J.B. Hunt Carriers undertake activities in furtherance of this agreement, including offering on and booking loads on the TruckSmarter platform.

**ANSWER:**   TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 155 of the Amended Complaint, including because J.B. Hunt has not defined "in furtherance of" and, therefore, denies those allegations.  TruckSmarter admits that some carriers have offered and booked loads on the TruckSmarter platform.

156.   The J.B. Hunt Carriers provide their Carrier 360 log-on credentials in furtherance of the agreement.

45

**ANSWER:** TruckSmarter admits that some carriers have provided it with their log-on credentials. TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 156 of the Amended Complaint, including because J.B. Hunt has not defined "in furtherance of" and, therefore, denies those allegations.

157. The Arkansas Carriers take the above-mentioned steps in furtherance of the agreement in Arkansas.

**ANSWER:** TruckSmarter admits that some carriers have provided it with their log-on credentials. TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations in paragraph 157 of the Amended Complaint, including because J.B. Hunt has not defined "in furtherance of" and, therefore, denies those allegations.

158. The Conspiracy is specifically evidenced by the following non-exhaustive list of circumstances:

a. TruckSmarter solicits J.B. Hunt Carriers.

b. TruckSmarter requests J.B. Hunt Carriers' log-on credentials for Carrier 360.

c. The J.B. Hunt Carriers provide their log-on credentials for Carrier 360.

d. Through the unauthorized use of the J.B. Hunt Carriers' credentials, TruckSmarter accesses and integrates with Carrier 360.

e. Through the unauthorized use of the J.B. Hunt Carriers' credentials, TruckSmarter accesses, uses, and extracts Higher-Tier Data and historical Bid Data for its own financial and commercial benefit,

      f.      Through the unauthorized use of the J.B. Hunt Carriers' credentials, TruckSmarter accesses, uses, and extracts Higher-Tier Data and historical Bid Data hosted on J.B. Hunt's computer systems and servers.

      g.      The J.B. Hunt Carriers subsequently use the TruckSmarter platform to place offers on and book loads such that TruckSmarter obtains Bid Data to which it would not otherwise have had access but for TruckSmarter's wrongful conduct.

      h.      TruckSmarter uses and extracts this data for its own benefit.

**ANSWER:**  Paragraph 158 purports to state legal conclusions to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 158 of the Amended Complaint.

159.    Truck Smarter never sought the permission or consent from J.B. Hunt to take the above-mentioned actions.

**ANSWER:**  TruckSmarter denies that it was under any obligation to seek the permission or consent of J.B. Hunt and admits that it did not do so.

160.    TruckSmarter is conspiring with certain J.B. Hunt Carriers to convert and misappropriate J.B. Hunt's trade secrets and other confidential information in a manner that violates Arkansas and federal law (as alleged above) so that TruckSmarter could use the information for financial gain and in competition with J.B. Hunt.

**ANSWER:**  TruckSmarter denies the allegations in paragraph 160 of the Amended Complaint.

161.    TruckSmarter intends to harm J.B. Hunt and to benefit itself by effectuating the Conspiracy.

**ANSWER:** TruckSmarter denies the allegations in paragraph 161 of the Amended Complaint.

162.    TruckSmarter and the J.B. Hunt Carriers who conspired with TruckSmarter knew or reasonably could have known that the Conspiracy would impact Arkansas and be felt in Arkansas for at least the following reasons:

      a.    The J.B. Hunt Carriers agreed to maintain the confidentiality of its log-on credentials in the Carrier Terms and Conditions, which contained an Arkansas choice of law and Arkansas venue provision;

      b.    TruckSmarter induced the J.B. Hunt Carriers to breach the Carrier Terms and Conditions;

      c.    TruckSmarter accessed J.B. Hunt's trade secrets, confidential information, computer systems, and servers knowing that J.B. Hunt did not authorize or consent to such conduct; and

      d.    TruckSmarter and the J.B. Hunt Carriers took the steps listed above while knowing that J.B. Hunt, as well as its trade secrets, confidential information, computer systems, and servers were located in Arkansas.

**ANSWER:** TruckSmarter admits that it knew that J.B. Hunt was located in Arkansas. TruckSmarter lacks knowledge sufficient to form a belief as to the truth or falsity of what J.B. Hunt Carriers knew or reasonably could have known and, therefore, denies those allegations. TruckSmarter denies all other allegations in paragraph 162 of the Amended Complaint.

163.    The Conspiracy has proximately caused damages to J.B. Hunt in an amount to be proven at trial.

**ANSWER:**  Paragraph 163 of the Amended Complaint purports to state a legal conclusion to which no response is required.  To the extent a response is required, TruckSmarter denies the allegations in paragraph 163.

### PUNITIVE DAMAGES & OTHER MATTERS

164.    Due to the egregious, fraudulent, and intentional misconduct of TruckSmarter described above, J.B. Hunt is entitled to punitive damages in an amount to be determined by the Jury. In addition to being intentional, TruckSmarter knew or ought to have known, in the light of the surrounding circumstances, that its conduct would naturally and probably result in damage to J.B. Hunt, and it nonetheless continued such conduct with malice and/or in reckless disregard of the consequences from which malice may be inferred.

**ANSWER:**  TruckSmarter denies the allegations in paragraph 164 of the Amended Complaint.

165.    J.B. Hunt requests a trial by jury.

**ANSWER:**  J.B. Hunt has not presented any issues triable of right before a jury. To the extent that there are issues appropriate for a trial by jury, TruckSmarter does not object.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, J.B. Hunt Transport Services, Inc., prays as follows:

(a)    Judgment in J.B. Hunt's favor and against TruckSmarter on all causes of action alleged herein;

(b)    Compensatory damages as a result of TruckSmarter' s unlawful acts and omissions in an amount to be proven at trial, including but not limited to the value of the trade secrets that have been misappropriated as of the date of judgment, together with reasonable attorneys' fees, pre-judgment and post-judgment interest as allowed by law, costs, and additional costs of collection;

49

(c)     Punitive damages in an amount to be proven at trial and sufficient in amount to punish and deter the egregious, intentional, and malicious conduct described in this Complaint;

(d)     A permanent injunction barring TruckSmarter from:

a.      Tortiously interfering with J.B. Hunt's Carrier Terms and Conditions;

b.      Accessing J.B. Hunt's computer, computer system, computer network, computer program, or data;

c.      Extracting any data from J.B. Hunt's computer networks and systems and return all data and information previously extracted;

d.      Misappropriating J.B. Hunt's trade secrets, including but not limited to the Higher- Tier Data and the Bid Data; and

e.      Ordering TruckSmarter to permanently destroy any and all Higher Tier Data, Bid Data, and other trade secrets and confidential information that has been extracted; and

(e)     Such other and further relief as the court may deem to be just and proper.

## **PRAYER FOR RELIEF ANSWER**

These paragraphs set forth the statement of relief requested by J.B. Hunt to which no response is required.  TruckSmarter denies that J.B. Hunt is entitled to any of the requested relief and denies all allegations.

## AFFIRMATIVE DEFENSES

Subject to the responses above, TruckSmarter alleges and asserts the following defenses in response to the allegations, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein.  In addition to the affirmative defenses described below, subject to their responses above, TruckSmarter specifically reserves all rights to allege additional affirmative defenses that become known through the course of discovery.

## FIRST DEFENSE

### Estoppel

1.      J.B. Hunt's claims are barred, in whole or in part, by the doctrine of estoppel.

## SECOND DEFENSE

### Unclean Hands

2.      J.B. Hunt's claims are barred, in whole or in part, by the doctrine of unclean hands.

## THIRD DEFENSE

### Laches

3.      J.B. Hunt's claims are barred, in whole or in part, by the doctrine of laches.

## FOURTH DEFENSE

### Failure to Mitigate

4.      J.B. Hunt's claims are barred, in whole or in part, by its failure to mitigate any damages allegedly sustained.

## FIFTH DEFENSE

### No Injury

5.      J.B. Hunt's claims are barred, in whole or in part, because J.B. Hunt has suffered no actual injury in fact and therefore has suffered no damages for which TruckSmarter can be liable.

## SIXTH DEFENSE

### Preemption

6.      The state law tort and trespass claims asserted in the Amended Complaint are preempted, in whole or in part, by federal law, including without limitation, the Computer Fraud and Abuse Act.  In the alternative, certain of the state law claims are preempted by the Arkansas Trade Secrets Act.

## SEVENTH DEFENSE

### Acting in Good Faith

7.      J.B. Hunt's claims are barred, in whole or in part, because TruckSmarter acted at all times in good faith.

## EIGHTH DEFENSE

### Intervening or Superseding Causes

8.      If J.B. Hunt has sustained any injuries or damages, such were the result of intervening or superseding events, factors, occurrences or conditions, which were in no way caused by TruckSmarter and for which TruckSmarter is not liable.

## NINTH DEFENSE

### Competition Privilege

9.      J.B. Hunt's claims are barred, in whole or in part, because TruckSmarter had a legitimate economic interest in any contractual relations and only acted reasonably and in good faith to protect those interest.

## TENTH DEFENSE

### Punitive Damages Unconstitutional

10.      J.B. Hunt's claims for punitive damages are barred or reduced by applicable law or statute or, in the alternative, are unconstitutional insofar as they violate the due process protections afforded by the United States Constitution, the excessive fines clause of the Eighth Amendment of the United States Constitution, the Full Faith and Credit Clause of the United States Constitution, and applicable provisions of the Constitution of the State of Arkansas or that of any other state whose laws may apply.

## ELEVENTH DEFENSE

### Reservation of Rights to Assert Additional Defenses

11.      TruckSmarter reserves the right to assert additional defenses upon discovery of further information concerning J.B. Hunt's claims.

## DEFENDANT TRUCKSMARTER, INC.'S COUNTERCLAIMS

## NATURE OF THE DISPUTE

1.     Counterclaim-Plaintiff TruckSmarter, Inc. ("TruckSmarter") offers an innovative load board—a centralized marketplace where truck drivers (including the motor carriers or "carriers" that often employ them) can view and book jobs delivering freight (or "loads").  The outdated trucking industry badly needs TruckSmarter's platform:  it helps carriers book loads more easily;  expands the market by driving more business to incumbent freight brokers like Counterclaim-Defendant J.B. Hunt Transport, Inc. ("J.B. Hunt"); and it brings price transparency to a market that has long been starved for it.  Confirming that, in a competitive marketplace, TruckSmarter's solution would benefit all market participants, J.B. Hunt itself has made millions of dollars from TruckSmarter, by virtue of the fact that TruckSmarter helps carriers book loads through J.B. Hunt.

2.     But J.B. Hunt has decided that the price transparency TruckSmarter offers represents a threat to its antiquated business model and its entrenched position within the industry. So, rather than allowing TruckSmarter to grow its business, as would happen in a competitive market, J.B. Hunt has sought to preserve the status quo by colluding with a group of other large freight brokers—its direct competitors—to stifle the procompetitive developments that TruckSmarter brings.  J.B. Hunt has spent the past year orchestrating a boycott of TruckSmarter in an attempt to drive it out of business, to the detriment of carriers around the country and to competition in the trucking industry.  These actions represent a flagrant, *per se* violation of the federal antitrust laws, and TruckSmarter now brings these counterclaims to seek redress for them.

3.      As J.B. Hunt itself acknowledges, the trucking industry is "fragmented" and broken.[1]  Motor carriers must spend hours and juggle numerous smartphone applications and websites just to book loads (*i.e.*, jobs delivering goods).  Even then, carriers often are not paid for a month or more after delivering their loads.  The result is that carriers waste large amounts of money and time searching for work, and then wait weeks to get paid.  Large incumbent brokers like J.B. Hunt benefit greatly from this opacity—they can increase their margins by restricting pricing transparency and forcing carriers into their ecosystems.  As a result, these large brokers have gone to great lengths to maintain the status quo and limit transparency, thereby boxing out newcomers.

4.      TruckSmarter is the first and only company to provide a workable, cost-effective solution to the opacity and fragmentation in the trucking industry.  TruckSmarter developed and operates a groundbreaking smartphone app that aggregates information about loads in a centralized, user-friendly interface where carriers can easily view and bid on loads in real time, with no delay, for free.  Additionally, TruckSmarter offers its users the option of receiving immediate payment for their work in exchange for a small fee.  This system benefits carriers, the businesses they service, and consumers, because it makes the market function more smoothly, improves price competition, and results in more loads getting delivered quicker.

5.      But, as often happens with technological innovations, certain large incumbent players in the market do not want TruckSmarter to gain widespread adoption.  J.B. Hunt is a prime example of this.  It is a long-standing broker, meaning it operates a "load board" where carriers

---

[1]  J.B. Hunt, *Convoy, J.B. Hunt, and Uber Freight Join Forces to Tackle Lack of API Standards Across Freight Shipments*, Dec. 5, 2022, available at https://www.jbhunt.com/our-company/newsroom/2022/12/convoy-jb-hunt-uber-freight-join-forces-api-standards-across-freight-shipments.

can view and bid on loads brokered only by J.B. Hunt. J.B. Hunt's load board has one of the highest market shares of any broker. And J.B. Hunt views TruckSmarter as a threat, because TruckSmarter provides carriers with transparency for loads across various brokers throughout the market, so that carriers can make informed decisions about which brokers to work with and how to best run their businesses.

6. J.B. Hunt could have worked with TruckSmarter and allowed TruckSmarter to access its load information so that carriers could more easily access that load information. This would have driven more volume and new user referrals to J.B. Hunt overall, just as sharing real estate listings with Zillow makes it easier for potential home buyers to see them and increases the number of offers on a given house. Indeed, many industries, such as real estate (Zillow), financial markets (stock exchanges), and travel bookings (Expedia), operate in this manner, and prove that having a centralized source of real-time pricing information benefits the entire marketplace.

7. But J.B. Hunt decided that, while it might individually be in J.B. Hunt's interest to work with TruckSmarter, it was in the ***collective*** interest of J.B. Hunt and its competitor large brokers to try and squash TruckSmarter. Put differently, J.B. Hunt realized that although it might ***individually*** make sense for J.B. Hunt to let carriers access its loads through TruckSmarter, the best thing for it would be if ***no*** brokers supported TruckSmarter, thereby driving it out of business. This would keep carriers from gaining price transparency, and keep small brokers from accessing technology to compete on a level playing field. But this strategy would only work if the brokers worked together, ensuring that none of them broke ranks and allowed TruckSmarter to post their load information. So, J.B. Hunt engaged in a boycott of TruckSmarter with a group of its direct competitors.

8.      Signs of the boycott first appeared in early 2022, when eight of the largest freight brokers, including J.B. Hunt, sent TruckSmarter a flurry of cease-and-desist letters raising virtually identical—and completely baseless—pretextual complaints about TruckSmarter.  All eight brokers sent letters within a six-month span between April and September 2022.  After the cease-and-desist letters, despite TruckSmarter's good faith efforts, J.B. Hunt and its co-conspirators collectively refused to deal with TruckSmarter.

9.      There is more.  TruckSmarter has uncovered direct evidence of the conspiracy, in the form of direct quotes by industry participants, who have told TruckSmarter that the brokers frequently discuss TruckSmarter "***to figure out whether to fight, be neutral and/or embrace***" ***TruckSmarter***.  The result of those collective discussions was patently anticompetitive:  J.B. Hunt and several other brokers decided together to "fight" TruckSmarter by attempting to cut off its access to their platforms, rather than "embrace" it.

10.     The antitrust laws do not allow direct, horizontal competitors to work together to "figure out whether to fight, be neutral and/or embrace" a new market participant.  J.B. Hunt's agreement with its competitors to do so is *per se* illegal.

## THE PARTIES

11.     Defendant/Counterclaim-Plaintiff TruckSmarter is a corporation organized under the laws of the State of Delaware, having its principal place of business in San Francisco, California.

12.     Plaintiff/Counterclaim-Defendant J.B. Hunt is a corporation organized under the laws of the State of Georgia, having its principal place of business in Lowell, Arkansas.

## JURISDICTION AND VENUE

13.    This Court has subject-matter jurisdiction over TruckSmarter's counterclaim pursuant to 28 U.S.C. § 1331 because the claim arises "under the Constitution, laws, or treaties of the United States."  Specifically, TruckSmarter asserts violations of the federal antitrust laws.

14.    The Court has personal jurisdiction over J.B. Hunt because it has sufficient minimum contacts with the State of Arkansas and has directed its unlawful activities at the State of Arkansas.  Specifically, J.B. Hunt is "at home" in Arkansas, where it is headquartered and has its principal place of business.

15.    The Court also has personal jurisdiction over J.B. Hunt because J.B. Hunt consented to this Court's jurisdiction by virtue of bringing its own claims in this Court.

16.    Venue is proper in the Fayetteville Division of the Western District of Arkansas pursuant to 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in Lowell, Arkansas, and "a substantial part of property that is the subject of the action is situated" in Lowell, Arkansas, within the Fayetteville Division of the Western District of Arkansas.  Specifically, J.B. Hunt engaged in anticompetitive conduct in Lowell, Arkansas, where it has its principal place of business.

## FACTUAL ALLEGATIONS

I.    **TRUCKSMARTER BRINGS TRANSPARENCY AND COMPETITION TO THE OPAQUE AND OUTDATED TRUCKING INDUSTRY**

A.    **The Trucking Industry Remains Stuck in the Past**

17.    The trucking industry is vital to the American economy.  It generates more than $800 billion in revenue each year, employs nearly 6% of the American workforce, and moves more

than 80% of freight annually, ensuring consumers and businesses can obtain the goods they need.[2] The industry also helps sustain small businesses: of the 1.8 million trucking companies in the United States, 91% operate six or fewer trucks.[3]  This is because technological advances have made it easier for drivers to operate as independent owner-operators who book their own freight.

18.     Despite its importance to American commerce, the trucking industry remains stuck in the past.  The industry relies on antiquated and inefficient systems to connect shippers who need loads moved with the carriers who move them.[4]  These outdated systems benefit a select group of large brokers, but not drivers, shippers or consumers.

19.     Today, as in the past, numerous brokers operate as middlemen between shippers who need loads moved and the carriers who move them.[5]  Most brokers operate their own "load board," which, today, are online platforms where carriers can see and bid on freight loads.  These are often tightly controlled by the broker operating them, which sometimes limits the amount of information carriers can see on a given load board or calibrates carriers' access based on the brokers' commercial goals.  Electronic load boards also add even more sources of information to an already fragmented marketplace, since any given broker's load board platform typically only displays loads for that particular broker.

20.     As a result, there is no free central marketplace for booking freight that offers the number of loads that TruckSmarter does.  Unlike, say, equity securities—which trade on

---

[2]     Jason Dasher, *19 Statistics You Should Know About the Trucking Industry*, CAPITAL SOLUTIONS TRUCK FINANCING, June 6, 2022, https://capitalsolutionstruckfinancing.com/19-statistics-you-should-know-about-the-trucking-industry/.

[3]   *Id.*

[4]   *Id.*

[5]   Dkt. No 48, Amended Complaint ("Compl.") ¶ 9.

exchanges like the New York Stock Exchange where all market participants can view bids and offers in real time—carriers are forced to navigate a complex array of broker load board, each with its own account, login information, and load board.  And unlike the real estate industry, where many properties are listed on websites and apps like the MLS, Zillow and Redfin, there is no central, comprehensive source of information about loads in the trucking industry.  Nor is there a free central platform where carriers can compare prices from brokers across the trucking industry, as is the case in the travel industry (*e.g.*, Orbitz, Expedia, Kayak, etc.).

21.     This balkanized freight landscape creates significant challenges for carriers, who must devote substantial time to searching for and comparing load prices, and who sometimes miss loads that would be economically beneficial for them due to the lack of a transparent, centralized marketplace.  As J.B. Hunt acknowledges in its own marketing materials, "Calling and emailing brokers to get and compare freight quotes is time consuming."[6]  Today, drivers use as many as 40 mobile applications and subscription services to do their job.[7]

22.     A select group of brokers (including J.B. Hunt) dominate the electronic load board market.  A staggering *99%* of broker app downloads are for the top seven carriers: Uber Freight LLC ("Uber Freight"); J.B. Hunt; C.H. Robinson Worldwide, Inc. ("C.H. Robinson"); Convoy, Inc. ("Convoy")[8]; Total Quality Logistics, LLC ("Total Quality Logistics"); Landstar System, Inc. ("Landstar System"); and Coyote Logistics, LLC ("Coyote Logistics").[9]

---

[6]  J.B. Hunt, *Streamline Shipping with Shipper 360 and SAP Systems*, Feb. 28, 2022, available at https://www.jbhunt.com/blog/j-b-hunt-360/shipper/shipper-360-sap-systems.

[7]  TruckSmarter – About Us, https://www.trucksmarter.com/about/about-us.

[8]  Since TruckSmarter filed its first Complaint, Convoy has filed for bankruptcy.  Convoy's past actions, including forming a conspiracy with J.B. Hunt, remain relevant.

[9]  UBS Financial Services, *U.S. Truck Brokerage Will CHRW Get "Uber-ed"? UBS Evidence Lab  Analysis + Industry Contacts Suggest They Will Not*, June 12, 2018, available at

23.     These large brokers benefit from and deliberately maintain the balkanized freight landscape.  Brokers with app-based load boards hoard information relating to the jobs they post because they profit by driving traffic to their own apps and locking carriers into their "ecosystems." For large brokers like J.B. Hunt, load information opacity is a feature, not a bug: discouraging carriers from comparing loads across load boards benefits the broker at the expense of carriers who would otherwise make wider price comparisons and choose potentially more economic loads offered by competitors.  Proving as much, J.B. Hunt's brokerage division had over *$2 billion* in revenue in 2022.  Large brokers like J.B. Hunt are thus incentivized to preserve the antiquated, fragmented freight market.

24.     J.B. Hunt admits that it keeps certain information (specifically, "names of the shippers, the time of pick-ups and drop-offs, and the shipping routes") from even some of its *own* users, providing that information only to "higher-tier Carriers"—drivers who have completed a certain number of jobs on its platform.[10]  This opaque and outdated system keeps carriers from finding the most lucrative contracts—and in some cases from finding work at all.

25.     The fragmented freight marketplace also prevents small and startup brokers from competing effectively with large brokers.  Carriers forced to navigate dozens of app-based load boards are incentivized to frequent the largest load boards with the most potential jobs.  This keeps large brokers like J.B. Hunt at the top of the food chain, while raising barriers to entry for smaller brokers who have much more difficulty competing in a fragmented, opaque market where large brokers have an inherent advantage.

---

https://inmotionglobal.com/assets/Press%20Releases/UBS%20Report%20-%20CHRW,%20Uber%20Freight%20and%20the%20state%20of%20logistics%20digitization.%20June%202018..pdf.

[10]  Compl. ¶¶ 11-12.

26.     Due to the inefficiencies and lack of transparency in the trucking industry, drivers spend $60,000 in fuel per year on average—an amount that would be lower if the system were more efficient.[11]  Moreover, a survey from Convoy found that as many as 35% of all miles driven are "empty," meaning that drivers are not carrying freight for over a third of the miles they drive.[12] J.B. Hunt's own research confirms these inefficiencies have significant costs for carriers, shippers and brokers.[13]  As J.B. Hunt puts it, a driver's time is like "that of an hourglass, a perishable commodity which is continually diminishing."[14]  "Inefficient time," which includes time lost to "inefficient appointments" and "planning uncertainty," cuts directly into a driver's ability to earn.[15]

27.     Additionally, carriers are frequently not paid until 30 to 45 days after a job is completed, forcing them to front the bill for gas, maintenance, or repairs.[16]  This imposes substantial hardships on carriers, especially those with a payroll to meet and independent drivers who may live paycheck to paycheck.

---

[11]   TruckSmarter – About Us, https://www.trucksmarter.com/about/about-us.

[12]    Jennifer Wong, *Sustainability in Trucking Snapshot Report: March 2022*, Convoy, available at https://convoy.com/blog/sustainability-trucking-report-march-2022/.

[13]   J.B. Hunt, *660 Minutes: How Improving Driver Efficiency Increases Capacity*, available at        https://www.jbhunt.com/content/dam/jbhunt/jbh/white-papers/white-paper-pdf-docs/660%20Minutes_How%20Improving%20Driver%20Efficiency%20Increases%20Capacity. pdf.

[14]   *Id.* at 2-3.

[15]   *Id.*

[16]   Dalton Godbey, *Louisville truck drivers sound alarm on rising diesel prices as shoppers face rising costs*, WDRB, June 14, 2022, https://www.wdrb.com/news/business/louisville-truck-drivers-sound-alarm-on-rising-diesel-prices-as-shoppers-face-rising-costs/article_a08ba062-ec19-11ec-86ec-03a4d9669a27.html ("The shippers — when they get paid is about 30-45 days out and now they're having to take on the extra cost of fuel and maintain that cost of fuel before they get paid.").

**B.     TruckSmarter Offers an Innovative Solution to Facilitate Competition in the Trucking Industry**

28.     TruckSmarter provides a solution for the problems that plague the trucking industry: it enables carriers to aggregate load postings from brokers with load boards with which those carriers have accounts, allowing drivers to compare and select loads without opening dozens of apps.  It also provides drivers with tools to save money on everyday expenses and address the lengthy wait time that they often face to get paid after transporting a load.  Investors and carriers alike recognize the numerous benefits of TruckSmarter's unique platform; since its launch in 2021, TruckSmarter has raised $44 million in funding and served more than 150,000 users.

29.     TruckSmarter addresses systemic issues within the trucking industry in two ways.

30.     *First*, TruckSmarter allows carriers to find loads in a single, centralized location, at no cost to users.  TruckSmarter's app reflects a groundbreaking development within the stagnant freight brokerage business.  Instead of comparing loads across dozens of apps and subscriptions, TruckSmarter allows carriers to link their load board and brokerage app accounts to TruckSmarter.[17]  Drivers can then view and bid on loads from various brokers in one app.

31.     This empowers drivers to efficiently compare thousands of loads from hundreds of sources and make informed bids without the time and effort spent jumping from app to app.  For that reason, TruckSmarter has been celebrated by drivers and carriers throughout the industry.  As Paye Logistics LLC in Little Rock, Arkansas put it, "you have to see everything.  Just use TruckSmarter."[18]

_____

[17]  Compl. ¶¶ 49-50.
[18]  Compl. ¶ 65.

32.     A single, centralized load board also levels the broker playing field and improves competition by giving smaller brokers more visibility than they can obtain in a fragmented industry in which each broker operates its own load board.  This allows startups and small brokers to compete with the large brokers like J.B. Hunt that have traditionally dominated the industry, enhancing competition.

33.     **Second**, TruckSmarter offers carriers both a fuel savings rewards program and the opportunity to get advance payment on loads, shortening the typical 30+-day wait for payment. This is how TruckSmarter makes money: it offers drivers same-day pay in exchange for a small fee.[19]   Drivers value this business model because it allows them to receive immediate and dependable compensation rather than waiting a month or more for payment.

34.     Not only is TruckSmarter's platform game-changing for carriers, it is also beneficial for large brokers like J.B. Hunt—at least when those large brokers are acting in their unilateral self interest and not as part of a conspiracy—because it helps them acquire and match capacity.   In the same way that Zillow helps real estate agents reach more potential buyers, TruckSmarter's centralized load board helps brokers reach and hire carriers faster and more efficiently by serving as a hub for their various platforms.

35.     In fact, in the past 12 months, carriers have placed more than 130,000 bids on J.B. Hunt loads totaling more than **$208 million dollars** bid through the TruckSmarter app.  When a carrier without a J.B. Hunt account is interested in booking a J.B. Hunt load on the TruckSmarter platform, TruckSmarter directs the user to J.B. Hunt's website in order for the carrier to register

---

[19]   Rebecca Bellan, *TruckSmarter comes out of stealth with a free load board for truckers*, TECHCRUNCH, Sept. 14, 2022, https://techcrunch.com/2022/09/14/trucksmarter-stealth-free-load-board-for-truckers/.

with J.B. Hunt.  So far, TruckSmarter has directed more than 10,000 users to sign up on J.B. Hunt's website.  J.B. Hunt has thus tangibly profited from TruckSmarter's launch.

36.     TruckSmarter's early success has won it the loyalty of drivers across the country. But despite offering functionality that benefits all market participants, TruckSmarter's growth cannot continue if the largest brokers collectively agree to refuse to do business with it.

**C.     Large, Incumbent Brokers Like J.B. Hunt Would Support TruckSmarter in a Competitive Market**

37.     It is in each broker's independent interest to join TruckSmarter's platform, just as it is in each airline's interest to make its flights available through aggregators like Expedia. Expedia took off because airlines like Delta knew that if Expedia users only saw flights from competitors like American Airlines and United, it would suffer competitively.  By gathering users who needed flights and providing them with a simple interface to compare routes, flight times and prices, Expedia offered airlines a valuable channel to market and sell their services.  The airlines in turn benefited Expedia and its users by making their services available and easy to compare. This dynamic applies in any competitive market – more visibility and access leads to better overall outcomes for buyers and sellers.

38.     Brokers and drivers likewise benefit from working with TruckSmarter.  Making loads available on TruckSmarter drives more volume to the broker and prevents them from being left behind as the market evolves.  Smaller brokers such as Axle Logistics, ATS Logistic Services (Sureway), Armstrong Transport Group, Pepsi Logistics Company, Straight Line Transport, KLC Logistics, Inc., CW Carriers USA, ReedTMS, Trident Transport, and Triple T Transport have recognized this and begun working with TruckSmarter.

39.     In a competitive market, large brokers like J.B. Hunt would come to the same conclusion: that allowing TruckSmarter to post their loads is in their individual self-interest.  That

is because, in a competitive market—absent collusion—a large broker like J.B. Hunt that declined to allow its loads to be displayed on TruckSmarter would risk losing business to other large brokers that *did* allow their loads to be displayed on TruckSmarter.  Indeed, in a competitive market, large brokers like J.B. Hunt would face strong "first-mover" incentives to work with TruckSmarter, lest their competitors beat them to it and take market share from them.

40.     However, that is not what has happened.  Instead of acting in their unilateral self-interest, J.B. Hunt and several other large brokers have collectively sought to slam the brakes on TruckSmarter's development.  They have determined that doing so deprives TruckSmarter of the information it needs to function and therefore allows them to maintain the current antiquated, opaque market structure.  And J.B. Hunt is driving this anticompetitive conspiracy.

## II.    J.B. HUNT AND ITS COMPETITORS COORDINATE A BOYCOTT OF TRUCKSMARTER

### A.    J.B. Hunt and Its Competitors Agree to Boycott TruckSmarter in Early 2022

41.     TruckSmarter launched publicly in November 2021, quickly gaining users with its intuitive interface and solution to the problem of having to juggle various load boards.  By February 2022, J.B. Hunt, Uber Freight, Convoy, Transfix, Inc., Blue-Grace Logistics LLC, Knight-Swift Transportation Holdings, Inc., Nolan Transportation Group, LLC and Coyote Logistics had agreed to boycott TruckSmarter to halt its momentum.  Through phone calls, email conversations and likely other forms of communication such as in-person meetings, J.B. Hunt and the other brokers agreed to boycott TruckSmarter.

42.     TruckSmarter has propounded discovery requests to ascertain the exact date or dates the conspiracy was formed.  J.B. Hunt has not yet responded to TruckSmarter's requests.  But even without discovery, TruckSmarter has amassed significant evidence of the boycott.

43.     The first signs of this boycott emerged in early 2022.  Out of the blue, after initially gaining traction with some brokers, eight brokers, including J.B. Hunt, sent strikingly similar cease-and-desist letters to TruckSmarter over a six-month period.

44.     These letters came from the biggest players in the industry: four of the seven brokers that comprise 99% of app-based load board downloads sent TruckSmarter a cease-and-desist letter.[20]  Given that TruckSmarter had engaged with many of these brokers since going public and had reached various stages of business discussions, this coordinated salvo plainly was not coincidental.

45.     Specifically, Uber Freight sent letters on February 2 and May 25; Convoy on April 11; Transfix, Inc. on May 16; J.B. Hunt on June 7 and August 1; Blue-Grace Logistics LLC on June 17; Knight-Swift Transportation Holdings, Inc. on July 14; Nolan Transportation Group, LLC on July 29; and Coyote Logistics on September 19.

46.     The cease-and-desist letters also contained remarkably similar language and pretextual allegations.  Six of the letters baselessly accused TruckSmarter of violating trademark laws; five claimed that TruckSmarter illegally solicited drivers' login credentials for their app.  Indeed, J.B. Hunt has all but acknowledged the letters were "similar"—something that suggests it is familiar with the contents of those letters.

47.     Each letter was sent against the broker's individual self-interest—any one of them would have gained an advantage against its direct competitors by agreeing to work with TruckSmarter when other brokers refused.  But by coordinating to block TruckSmarter, the brokers

_____

[20]  *See* paragraph 21, supra.

have preserved their collective ability to maintain the fractured marketplace that privileges their position.

48.     The claims in the letters are as meritless as they are consistent.  The trademark allegations in the letters, for example, rested on baseless and nearly identical assertions: that TruckSmarter's limited use of their marks would confuse hapless carriers as to the relationship between the broker and TruckSmarter.  That is plainly incorrect.  TruckSmarter's website makes clear that its "load board pulls loads *from other sources* into one location so it is easier for independent owner operators to find loads."[21]  The TruckSmarter load board shows multiple brokers available, making it unlikely that a driver would mistake TruckSmarter for having a special relationship with any individual broker.  The load board also shows each broker's URL, making clear that users must connect with an external site to pull in their account, and eliminating any possible confusion among carriers.  Nevertheless, *six* different brokers raised the issue with TruckSmarter in a span of a few months.

49.     The trade secret claims are equally baseless.  The cease-and-desist letters assert that the pricing data brokers convey to carriers is a "trade secret."  But that is plainly incorrect, as such data is necessarily distributed to many different carriers across the country, with few if any limits on how those carriers use the data.  Data sets disseminated to thousands of entities around the country are not "trade secrets," and the brokers' assertions to the contrary were nothing more than a naked attempt to manufacture an excuse not to deal with TruckSmarter.

50.     The timing of the cease-and-desist letters is also highly suspicious.  TruckSmarter launched in November 2021, and the letters accused TruckSmarter of stealing trade secrets; yet,

---

[21]  Compl. ¶ 33.

the brokers did not begin sending the letters until several months after TruckSmarter's launch. Were these brokers truly concerned about the loss of their trade secrets (as they purported to be), one would expect them to act immediately. Instead, the letters began with no warning in February 2022—three months after TruckSmarter's launch—and continued through 2022. This shows that the letters were part of a coordinated plan to stymie TruckSmarter, not the result of eight different firms independently deciding to raise the same complaints months after TruckSmarter launched.

51.     That so many brokers sent cease-and-desist letters to TruckSmarter in such a short time span, with no apparent trigger, shows parallel conduct. That the letters parrot similarly meritless and implausible claims shows that the claims are a pretext for acting in concert against TruckSmarter, as it defies credulity that multiple firms would all concoct the exact same meritless legal theories during the same period of time without coordinating with each other.

52.     Nonetheless, in response, TruckSmarter attempted to address the brokers' concerns in good faith. TruckSmarter asked to speak with the brokers to explain the problems it had identified in the trucking industry, how its business operated, and how it might work collaboratively with the brokers that operate app-based load boards. TruckSmarter spoke with many of these brokers over email, phone calls, and video calls. For example, it met with J.B. Hunt on July 11, 2022 and took steps to address J.B. Hunt's concerns without conceding any improper conduct. In response to J.B. Hunt's baseless trademark claims, TruckSmarter removed J.B. Hunt's logos from its app. In response to J.B. Hunt's concerns that TruckSmarter was sharing certain "higher tier data" with J.B. Hunt carriers who do not have access to that data, TruckSmarter revised its app so that J.B. Hunt carriers using TruckSmarter's app could only access loads they would have access to on J.B. Hunt's own platform. But none of this appeased J.B. Hunt.

53.     Similarly, many of the brokers spent months expressing interest in working with TruckSmarter before quickly changing tack and deciding not to do so based on only the thinnest of explanations.  When TruckSmarter attempted to address the brokers' purported concerns in good faith, it was met with the same chorus of excuses from broker to broker.  When TruckSmarter would offer various options for how to present a broker's loads in its app, brokers invariably would bring up supposed security risks.  But TruckSmarter offers brokers several options for user authentication—in some cases, even offering to pay for brokers' technical upgrades to make the brokers' security systems compatible—when linking user accounts to TruckSmarter.  When TruckSmarter explained its security systems and offered to work with brokers on security, the response was both similar and irrational: the brokers professed to be simply not interested in TruckSmarter's services after all.

54.     Some brokers also raised another parallel (and meritless) excuse: they claimed that offering loads on TruckSmarter would be "too much work" on their end.  They raised this concern even though TruckSmarter explained that offering loads on TruckSmarter required *no* work on their end, as TruckSmarter was willing to tackle any such work for them.  These excuses were pretextual: the real explanation turned out to be that the brokers were coordinating their response to TruckSmarter and had collectively resolved not to deal with it.

55.     In at least one case, a broker representative all but admitted that their concerns with TruckSmarter stemmed from the fact that its platform promotes competition.  For example, when discussing the possibility of working with TruckSmarter, Julio Donoso of Knight-Swift explained that the company did not want its loads on TruckSmarter "alongside other loads"—*i.e.*, it did not want carriers to have price transparency.

56.     What is particularly striking about these excuses is that posting loads on TruckSmarter is the only way for brokers to gain a digital presence *for free*.  Otherwise, brokers must either spend money to build their own digital applications or spend money to integrate their existing load boards into other paid online load board aggregators, such as DAT.[22]  Even if smaller brokers wanted to create their own apps, they run into a visibility problem due to their lack of scale—they are low on the list of accounts that a carrier is likely to check if carriers know that they have many fewer loads than big players like J.B. Hunt.  TruckSmarter levels the playing field— and thus promotes competition—by allowing brokers to post loads for free and giving smaller brokers the visibility that they would otherwise struggle to gain.  Given this, the brokers' excuses are plainly pretextual.

**B.      TruckSmarter Uncovers Direct Evidence of the Conspiracy**

57.     In addition to the above, TruckSmarter has uncovered direct evidence of the conspiracy—evidence that is undoubtedly just the tip of the iceberg.

58.     Over the past year, executives at ***four different brokers***—Schneider National, Convoy, Nolan Transportation Group, and PLS Logistics Services—have told TruckSmarter that brokers are discussing and coordinating their response to TruckSmarter.  These discussions included whether the brokers should take collective action against TruckSmarter—and confirm they resolved to do so.

59.     For example, in April 2022, Ben Schuchart, a Senior Vice President at Schneider National told TruckSmarter:  "***People are figuring out whether to fight***, but we're okay with it." Here, "people" is plainly a euphemism for the incumbent brokers, including J.B. Hunt.  And of

---

[22]   DAT is a company that sells various paid subscription plans that in some cases include an online load board, freight data analytics and other services to carriers, shippers and brokers.

course, those brokers have now resolved "to fight" TruckSmarter by collectively refusing to partner with it.  That Schneider National was, at least at one point, "okay with" TruckSmarter also confirms that it would be in each individual broker's interest to allow TruckSmarter to access their loads, such that their collective refusal to deal can only be explained as the result of a conspiracy.

60.     More explicitly, Convoy's Chief Business Development Officer, Brooks McMahon, told TruckSmarter's CEO, Daniel Kao, and TruckSmarter's Chief Technology Officer, Paolo Bernasconi on May 9, 2022 that **"the industry is largely trying to figure out whether to fight, be neutral and/or embrace" TruckSmarter**.  "The industry" plainly includes incumbent load boards like J.B. Hunt and its competitors, the other load boards.

61.     Then, in a conversation that occurred in approximately August 2022, Nolan Transportation Group Executive Vice President Mark Carroll told TruckSmarter CEO Daniel Kao that **all the brokers talk to each other about TruckSmarter** and asked him: **"You know how you're perceived in this industry, right?"**  In another conversation, Kao mentioned to Carroll that some brokers had begun supporting TruckSmarter.  In response, Carroll expressed surprise that any brokers would work with TruckSmarter and said he'd have to chat with the other brokers to see if this was true.  Here, again, the references to brokers speaking with each other about TruckSmarter undoubtedly refer to J.B. Hunt, along with the other incumbent brokers.

62.     Similarly, on August 18, 2023, PLS Logistics Services ("PLS"—a broker and large load board provider) Senior Vice President Mark Kummer told TruckSmarter's Head of Business Development, Peter Quinn, that CEOs **from five of the largest brokers had called him to discuss TruckSmarter in the previous two weeks**.  Kummer also told TruckSmarter that at least five brokers are tracking and/or sharing data with each other about which carriers are booking loads

through the TruckSmarter platform.   Based on J.B. Hunt's market share and reaction to TruckSmarter, it is likely one of the brokers to which Kummer referred.

63.     Confirming as much, even more recently, Kummer told TruckSmarter that he spoke about TruckSmarter with J.B. Hunt's General Counsel for more than an hour on August 14, 2023. Kummer told TruckSmarter that, in his discussion with J.B. Hunt, J.B. Hunt made clear it was recruiting its competitors to file litigation against TruckSmarter.   This shows both that J.B. Hunt has been coordinating with its competitors, and that its lawsuit is pretextual and baseless, or else it would not need to try and woo its competitors to take legal action in order to shore up its claims.

64.     Kummer also admitted that PLS was "tracking" TruckSmarter's activities and had offered to share information about TruckSmarter with J.B. Hunt.   This again confirms that J.B. Hunt and its competitors share information about TruckSmarter and have aligned their responses to TruckSmarter.

65.     Even more remarkably, the following day, Kummer messaged Quinn on LinkedIn, urging TruckSmarter to "apologiz[e] to *the industry*."   Kummer warned Quinn, "*you guys are going to have an uphill battle as it's not just PLS, JB Hunt, [and] Convoy . . . talking about this*."   This is unambiguous evidence of a boycott of TruckSmarter that includes J.B. Hunt, PLS, Convoy, and the other large incumbent brokers.

66.     Then, on September 15, 2023, Convoy's CEO (Dan Lewis) told TruckSmarter on a call that he had talked to many other brokers about TruckSmarter.   Lewis also explained, without prompting, that he has had conversations with other brokers about their apps.   Lewis went so far as to comment that Convoy is like a "family member that helps out the others when there is a technical problem."   It is highly telling that the CEO of a large broker (Convoy) frequently speaks

to his direct competitors about the market generally and TruckSmarter specifically, and refers to his competitors as "family."

67.    Additionally, TruckSmarter has uncovered evidence that J.B. Hunt actively discourages carriers from using TruckSmarter, and uses its leverage to retaliate against carriers who use TruckSmarter.  In one call with TruckSmarter customer service representative Alison Clark on May 30, 2023, a user complained that if he booked J.B. Hunt loads through TruckSmarter, J.B. Hunt would not honor the booking, and that J.B. Hunt is "a stickler for [carriers] not to use TruckSmarter."  This behavior would not make sense unless J.B. Hunt knew that other brokers were similarly boycotting TruckSmarter, because in a competitive market, failing to honor bookings would just result in carriers booking loads with J.B. Hunt's competitors.

68.    Other large brokers have not only attempted to cut off TruckSmarter's access to their platforms, but have told carriers not to book loads on TruckSmarter.  A representative from Schneider National, for example, told carrier Ken Tuggle Enterprises LLC on September 27, 2023 not to book loads with TruckSmarter.  Schneider National told Ken Tuggle that his account would be deactivated if he continued to book and bid on loads through the TruckSmarter platform.  These extreme and punitive actions against a carrier show that the conspirators are willing to take actions against their individual self-interest—i.e., alienating carriers that book loads with them—in order to grind TruckSmarter down.

69.    Unfortunately, the conspiracy is working: this boycott has already harmed TruckSmarter's ability to attract and retain carriers to use its platform.  TruckSmarter's internal data shows that even though the loads offered by J.B. Hunt and its co-conspirators account for only 15-20% of user interactions on TruckSmarter's app, retention of users who interact with these brokers' loads improves by upwards of 32% compared to users who never interact with them.  The

boycott thereby reduces TruckSmarter's user retention, which in turn harms its attractiveness to shippers and its bottom line.  It also forces TruckSmarter to devote engineering resources to increasing user retention and engagement, when those resources could be spent elsewhere, such as building out its platform or growing its business.  Overall, TruckSmarter has attracted less users, grown more slowly, and been less profitable because of the conspiracy than it would have been in a competitive market.

C.    **J.B. Hunt Creates the "Scheduling Standards Consortium" to Mask Its Conspiracy**

70.    J.B. Hunt was not content just to help orchestrate a boycott of TruckSmarter.  It went further, and created an industry-backed "consortium" that seeks to mimic TruckSmarter's innovative approach, but in such a way that the incumbent players in the industry can control its development.

71.    In late 2022—after the coordinated campaign of cease-and-desist letters—Convoy, J.B. Hunt, and Uber Freight announced the formation of the "Scheduling Standards Consortium," or "SSC."  The SSC is nominally aimed at addressing similar types of industry inefficiencies that TruckSmarter publicly identified and had discussed with these carriers.[23] https://www.jbhunt.com/our-company/newsroom/2022/12/convoy-jb-hunt-uber-freight-join-forces-api-standards-across-freight-shipmentsOther brokers subsequently joined the SSC, including Coyote Logistics.[24]

---

[23]    *Convoy, J.B. Hunt, and Uber Freight Join Forces to Tackle Lack of API Standards Across Freight Shipments*, December 5, 2022, available at https://www.jbhunt.com/our-company/newsroom/2022/12/convoy-jb-hunt-uber-freight-join-forces-api-standards-across-freight-shipments.

[24]    *The Scheduling Standards Consortium Adds Collaborators and Reveals 2023 Milestones*, May 1, 2023, available at https://www.freightapis.org/ssc-collaborators-2023-milestones.

72.     The press release announcing the SSC reads as if it was lifted from TruckSmarter's website.  Spencer Frazier, a J.B. Hunt executive vice president, added that "[t]echnology has ushered in a new era for transportation – new players, new apps, new platforms, new services. Yet, our industry remains extremely fragmented. . . . We want to create an open exchange of data so that the numerous TMS and digital freight platforms can communicate at a level where we can help one another when needed.  The voice of our customers is clear – collaboration will drive progress."[25]

73.     These statements demonstrate how pretextual the brokers' refusal to deal with TruckSmarter has been: brokers like J.B. Hunt are fine with "an open exchange of data," so long as they can control it.  Their gripe with TruckSmarter is not that it infringes upon their intellectual property or somehow misuses their load information (it does not); it is that they want any change in the industry to come from a consortium they can all control.

74.     It is well recognized that collaborations among horizontal competitors like the SSC pose a high risk of anticompetitive harm and can act as a smokescreen for collusion.  As the Antitrust Guidelines for Collaborations Among Competitors issued by the Federal Trade Commission and Department of Justice explain:

> Competitor collaborations may harm competition and consumers by increasing the ability or incentive profitably to raise price above or reduce output, quality, service, or innovation below what likely would prevail in the absence of the relevant agreement.  Such effects may arise through a variety of mechanisms.  Among other things, **agreements may limit independent decision making or combine the control of or financial interests in production, key assets, or decisions regarding price, output, or other competitively sensitive variables, or may otherwise reduce the participants' ability or incentive to compete independently**.[26]

---

[25]  *Id.*

[26]  Fed. Trade Comm'n & U.S. Dep't of Justice, *Antitrust Guidelines for Collaborations Among Competitors* 6 (2000) (emphasis added).

75.     The Guidelines further explain that:  "Anticompetitive harm may be observed, for example, if a competitor collaboration successfully mandates new, anticompetitive conduct or successfully eliminates procompetitive pre-collaboration conduct, such as withholding services that were desired by consumers when offered in a competitive market."[27]  That is what occurred here, where the development of the SSC came on the heels of a refusal by J.B. Hunt and other brokers to work with TruckSmarter, which had previously used their load information without issue.

76.     The risk of the SSC serving as a front for a conspiracy is particularly acute here. J.B. Hunt, Uber Freight, Coyote Logistics, and Convoy already possess substantial market power—together, they represent nearly 70% of app-based load boards.[28]  New market developments thus threaten only to "cannibalize their supracompetitive earnings."[29]  Because the incumbent brokers already control much of the market and profit greatly from its fragmented structure, they have little incentive to foster innovation in that market, launch new products or services, or improve the quality of existing products or services.  They have the opposite incentive: to preserve the antiquated market by working together to stifle procompetitive developments.  The creation of consortiums like the SSC thus carries no positive benefits and only "increase[s] the likelihood of an exercise of market power by facilitating explicit or tacit collusion."[30]

77.     That is what happened here: J.B. Hunt and other large brokers launched a consortium immediately after deciding not to work with TruckSmarter.  Through their coordinated

---

[27]  *See id.* at 12.

[28]  UBS Financial Services, *supra* note 6.

[29]  Fed. Trade Comm'n & U.S. Dep't of Justice, *supra* note 18, at 15.

[30]  *Id.* at 12.

actions, J.B. Hunt and other app-based load boards have jeopardized TruckSmarter's business model and ensured that any progress in the industry happens on their terms.

### D.   The Trucking Industry Is Primed for Collusion to Block New Entrants Like TruckSmarter

78.    The specific evidence of collusion among brokers is not surprising given that the freight brokerage industry is structured in such a way as to encourage this cartel-like behavior.

79.    *First*, there is a high level of communication and turnover among the dominant firms.  Broker employees and executives speak informally through industry groups like the Transportation Intermediaries Association, whose board includes executives from companies including Schneider National and C.H. Robinson.  Because employees often change jobs from one broker to another, there are open lines of communication between the brokers.  For this reason, the brokers are sometimes considered "frenemies" within the industry, as they should be competing with each other for business, but often have close ties due to connections their employees have forged while working at other brokers.

80.    *Second*, there are high barriers to entry to becoming a broker at scale.  Brokerage services are relatively interchangeable—*i.e.*, carriers and shippers care about the economics of the load, not who happens to be brokering it.  This means that brokers can only have a viable business by achieving a significant scale, maintaining a critical mass of shippers and carriers who regularly come to it such that it has a sufficient pool from which to match carriers and shippers.  This creates a chicken-and-egg problem for new entrants: without any loads to offer, a new broker cannot attract carriers, and without carriers to pick up loads, shippers will turn elsewhere to offer their loads.

81.    *Third*, pricing of loads is opaque, and in the absence of a service like TruckSmarter's, comparison between brokers is difficult and time-consuming for carriers.  The result is that carriers tend out of necessity to look first to a few of the largest load boards to source

78

their loads, effectively carving the carrier pool into fiefdoms controlled by brokers who have a strong incentive to keep carriers from looking elsewhere. This balkanized landscape both increases the value of collusion among brokers—by heading off price competition that would eat into brokers' margins—and simultaneously makes it easier for them to solidify market share by discouraging carriers from shopping around.

82.     ***Fourth***, load brokerage is a highly commoditized service. Loads are marketed and sold based on a standardized set of parameters, including date, distance, price, and in some cases considerations related to the contents of the load (*e.g.*, for hazardous materials or goods that need to remain refrigerated.) And the method of matching the shipper with the carrier is essentially identical across brokerages. Both shippers and carriers seek out the most economical offer, regardless of who connects them to it. It benefits shippers to have as many carriers as possible viewing and potentially offering to ship their loads, and it benefits carriers to compare as many loads as they can in as little time and for as little cost as possible. These factors facilitate collusion, as it is far easier for conspirators to collude and drive up the price of products when those products are interchangeable and commoditized, rather than highly differentiated such that buyers are encouraged to shop around based on factors other than price.

## III.    J.B. HUNT'S ANTICOMPETITIVE CONDUCT HAS HARMED COMPETITION IN THE RELEVANT MARKET

### A.    The Relevant Product Market is Loads Transported by Carriers and Brokered by an Intermediary, Including Through an Electronic Load Board, in the United States

83.     The relevant geographic market is the United States. The United States is a distinct geographic market because load boards often limit their posts to locations within the United States, and various laws, regulations, and import-export restrictions make international motor carrier

transportation distinct from intranational transportation.  Indeed, J.B. Hunt's own 2023 10-K discusses the relevant geographic market in terms of the "continental United States."[31]

84.     The relevant product market is loads transported by truck drivers (or carriers) and brokered by an intermediary, including through an electronic load board.  To begin with, loads transported by truck are distinct from loads transported in other manners, because trucks can often reach areas that other types of transportation (*i.e.*, rail, sea, or air) either cannot reach at all, or cannot reach cost-effectively.  Moreover, shipping via truck is often "end-to-end," meaning goods do not have to stop at predesignated stations, as they do with rail shipping.  Indeed, even goods shipped by rail, sea, or air frequently rely on shipping via truck for the last stage of their journey, confirming that other shipping mechanisms are no substitute for truck-based shipping.

85.     Within the market for delivering freight via truck, electronic load boards are a uniquely accessible product for carriers in the trucking industry, meaning loads brokered using such platforms represent a distinct product.  In particular, electronic load boards are user friendly and designed to be used on mobile devices—critical features for drivers who often book jobs on their smartphones while on the road.

86.     Thus, a hypothetical monopolist in the market for loads transported by truck drivers (or carriers) and brokered by an intermediary could profitably impose a small but significant non-transitory increase in price ("SSNIP") (*e.g.*, 5%) because customers looking to ship freight via truck would not have an alternative to doing so, and because it is increasingly infeasible to book loads without using an intermediary such as an electronic load board.

---

[31]     2022 J.B. Hunt 10-K at 2, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000728535/d7c9ba47-9240-4c24-9014-5095b325137b.pdf.

**B.      The Conspirators Have Market Power in the Relevant Market**

87.      J.B. Hunt and its co-conspirators have market power in the relevant market.  As noted, a select group of companies (including J.B. Hunt) dominate the market with their siloed load boards: 99% of app downloads are for the top seven brokers (*i.e.*, Uber Freight; J.B. Hunt; C.H. Robinson; Convoy; Total Quality Logistics; Landstar System; and Coyote Logistics).[32]

88.      J.B. Hunt is the second largest app-based load board—in 2018, Carrier 360 by J.B. Hunt constituted 19% of freight app downloads.[33]  J.B. Hunt's market share, while high on its own, is even larger when pooled with the market share of its competitors that it has conspired with. Because these brokers have conspired to boycott TruckSmarter, the relevant metric is not the individual market share of J.B. Hunt, but the collective market share of J.B. Hunt and its competitors.  For example, 66% of 2018 app downloads were for J.B. Hunt, Uber Freight and Convoy—the three brokers that launched the Scheduling Standards Consortium.  *See* paragraphs 70, 71, and 76, *supra*).

89.      Without discovery, it is difficult to obtain additional market share figures for J.B. Hunt and its co-conspirators.  But available sources further confirm that J.B. Hunt and its co-conspirators control a large portion of the market.  For example, one website estimated J.B. Hunt's market share in 2023 as approximately 23% in the "transport and logistics" industry.[34]  The number becomes much higher, of course, when the market shares of J.B. Hunt's co-conspirators are factored in, as they must be.

---

[32]   UBS Financial Services, *supra* note 6.

[33]   *Id.*

[34]   CSIMarket Company, *J b Hunt Transport Services Inc (JBHT)*, https://csimarket.com/stocks/competitionSEG2.php?code=JBHT (last updated September 14, 2023).

90.     Moreover, although the market is fragmented, as noted above, it bears emphasis that only certain larger brokers—like J.B. Hunt—have a national presence, as opposed to a purely regional presence, and thus can compete across the country.   Thus, J.B. Hunt and its co-conspirators have market power due to their status as some of the only companies that provide truly national load brokering services.

### C.     The Conspiracy Has Harmed Competition in the Relevant Market

91.     J.B. Hunt's conduct—in concert with other large brokers (*e.g.*, the co-conspirators)—has harmed and continues to harm TruckSmarter, including by threatening its long-term viability, creating immediate disruptions to its business, and slowing its growth.   J.B. Hunt's conduct harms carriers, shippers, and downstream consumers by artificially inflating prices and depriving carriers of a tool for comparing loads and selecting the most efficient opportunities.   J.B. Hunt's conduct threatens competition in the market by squashing innovation and diminishing the flow of commerce.

92.     The harm does not just fall on TruckSmarter.   J.B. Hunt's conduct has also injured competition more broadly:

93.     ***Reduced Price Transparency***:   J.B. Hunt's boycott directly targets the only free, centralized platform in which market participants can view and bid on thousands of loads from hundreds of sources, and where carriers can make informed bids without the time and effort spent jumping from app to app.   The purpose and effect of this agreement is to reduce price transparency in the relevant market, which increases costs for carriers and shippers and reduces overall efficiency in the market.   With reduced price transparency, J.B. Hunt and the other largest brokers can dictate prices to carriers and shippers, harming competition in the market and impairing thousands of carriers' ability to compete in the marketplace.

94.     ***Reduction of Competition Among Brokers***:  By agreeing with the other largest brokers not to post their loads to TruckSmarter, J.B. Hunt has eliminated a significant source of competition among the largest brokers.  By preventing loads it brokers from appearing in the TruckSmarter platform, J.B. Hunt forces carriers to log into and use its platform, which is limited to only loads that J.B. Hunt brokers, impairing carriers' ability to efficiently compare loads offered by competing brokers.  By coordinating a boycott of TruckSmarter among its largest competitors, J.B. Hunt has discouraged competition among those brokers by preventing carriers from efficiently comparing loads brokered by J.B. Hunt with loads brokered by its co-conspirators.  By effectively reducing the number of loads a carrier is able to consider and bid on, J.B. Hunt reduces price competition among brokers, to the detriment of the entire trucking industry.  And by making load comparisons more difficult, each competitor is able to keep carriers "locked in" to its own ecosystem, ensuring that carriers are less likely to view or bid on competitors' loads.

95.     ***Blocking New Entrants***:  The conspiracy has also insulated the large brokers against competition from smaller upstarts.  By attempting to steer users away from the only free, centralized load board to their own proprietary load boards, the large brokers discourage carriers from using the only source by which smaller brokers are able to gain significant visibility and access to the carrier market.  The "ecosystem" effect also reduces competition from smaller brokers, whose scale of operations may not justify carriers creating and monitoring myriad dedicated accounts, and whose loads would otherwise appear side-by-side with those offered by the large brokers on TruckSmarter's centralized load board.  TruckSmarter is a key avenue for smaller brokers to get their loads in front of carriers who otherwise may not see them because, given limited time and resources to hunt for loads, they otherwise often stick to the largest brokers' exclusive load board applications.  By offering to post loads for free on its platform, TruckSmarter

allows smaller, less-resourced brokers to gain a digital presence and market their loads side by side with the big players in the industry.  The conspiracy restricts these small brokers' access to carrier services and makes it even more difficult for them to achieve competitive scale, thereby injuring competition.

96.     ***Chilling Innovation***:  J.B. Hunt's anticompetitive conduct against TruckSmarter directly injures competition in the relevant market by threatening an innovative platform that promotes competition and efficiency in the relevant market.  In attempting to deprive the market of TruckSmarter's groundbreaking service, J.B. Hunt's boycott threatens to deprive the market of a vibrant and innovative competitor that would reduce costs and increase opportunities for carriers, shippers, and smaller brokers who continue to operate in a fragmented market.  It also sends a clear signal to other would-be entrants that the largest brokers will close ranks to protect what they consider to be their turf.  Thus, J.B. Hunt and its co-conspirators have deterred other companies from entering this market and chilled innovation, resulting in harm to all market participants and the consumers and firms who rely on the freight industry.

97.     ***Reducing Output***:  Finally, by impairing carriers' ability to compare loads and attempting to cut off smaller brokers' ability to achieve digital scale, J.B. Hunt and its co-conspirators have reduced overall output in the relevant market by interfering with the efficient matching of shippers' loads with carriers who are willing and able to transport them.  This inefficiency increases the percentage of time that carriers spend driving "empty", increasing their fuel and maintenance costs and wasting spare freight capacity.  Because trucking is the backbone of American freight transportation, the negative effects of J.B. Hunt's conduct reach every corner of the economy and impact every consumer.

### D.     The Conspiracy Violates Both the *Per Se* Rule and the Rule of Reason

98.     J.B. Hunt has engaged in a conspiracy among its horizontal competitors to boycott TruckSmarter and thereby injure competition in the relevant market.  The Court need look no further to find a violation of Section 1 of the Sherman Antitrust Act.  Carriers, shippers, and consumers across the United States have been injured by the co-conspirators' collective refusal to deal with TruckSmarter and thereby limit competition for load brokerage.  J.B. Hunt's agreement with its competitors to refuse to deal with and coordination of meritless legal action against TruckSmarter was entered into for the express purposes of reducing competition among them and thereby allowing them to charge supracompetitive prices.

99.     Even if the Court evaluates J.B. Hunt's conduct under the rule of reason, that conduct is unlawful, under both an abbreviated, "quick look" analysis and under a full "rule of reason" analysis.  There are no countervailing, procompetitive justifications for J.B. Hunt's orchestration of a conspiracy against TruckSmarter.  Although J.B. Hunt professes to have various gripes with TruckSmarter's business model, such complaints do not justify a group boycott.  Even if J.B. Hunt may *unilaterally* seek to address its alleged issues with TruckSmarter it cannot engage in a group boycott with its competitors to the detriment of TruckSmarter, carriers and shippers around the country, and competition in the market for brokered loads.

100.     Nor does the fact that J.B. Hunt sued TruckSmarter for alleged trade secret violations somehow cleanse its anticompetitive activities.  To be clear, TruckSmarter does not challenge J.B. Hunt's lawsuit itself as an anticompetitive act.  But at the same time, J.B. Hunt cannot coordinate an unlawful boycott of TruckSmarter, and then file a lawsuit to create a smokescreen for its anticompetitive conduct.  Regardless of the merits of J.B. Hunt's lawsuit, its boycott is unlawful under the antitrust laws.

101.    To the extent J.B. Hunt asserts that its coordination with its horizontal competitors was pursuant to the Scheduling Standards Consortium or some other purportedly lawful joint venture or interest, that also fails to justify its anticompetitive conduct.  To begin with, J.B. Hunt's boycott is per se unlawful, regardless of whether it was organized through a joint venture or some other means.  And if J.B. Hunt did use its joint venture to perpetuate the boycott (as appears to be the case), then that merely underscores the high risk of allowing direct competitors like J.B. Hunt and the other large incumbent brokers to combine their market power under the guise of a "joint venture."  At most, then, the creation of the Scheduling Standards Consortium is yet more evidence of parallel conduct and plus factors suggestive of a conspiracy; it certainly does not excuse J.B. Hunt's anticompetitive actions.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act

102.    Counterclaim-Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

103.    As alleged above, J.B. Hunt and its co-conspirators entered into and engaged in a horizontal combination or conspiracy in restraint of trade to restrict competition in the trucking brokerage market and to jointly boycott TruckSmarter, an entity that would introduce load board competition in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Such combination or conspiracy constitutes a naked, *per se* violation of the federal antitrust laws.

104.    Although J.B. Hunt's conduct is *per se* illegal, even if the Court were to evaluate J.B. Hunt's conduct under the rule of reason, it amounts to an unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale.  Specifically, there is no lawful, procompetitive justification for J.B. Hunt to conspire with its competitors to boycott TruckSmarter,

regardless of whether J.B. Hunt disapproves of TruckSmarter's business.  J.B. Hunt's conduct is thus subject to condemnation under a "quick look" or full rule-of-reason analysis as well.

105.    J.B. Hunt and its co-conspirators' combination, agreement, understanding, or concerted action was without procompetitive justification and occurred within the flow of, and substantially affected, interstate commerce.

106.    As a direct and proximate result of J.B. Hunt's and its co-conspirator's actions, competition in the motor carrier load app market has been severely curtailed.  TruckSmarter has been injured and financially damaged in amounts that are presently undetermined.  Its damages are directly attributable to J.B. Hunt's conduct.  TruckSmarter's injuries consist of artificially inflated costs or deflated proceeds associated with freight load boards in the United States caused by J.B. Hunt's misconduct.  TruckSmarter's injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes J.B. Hunt's conduct unlawful.

## SECOND CAUSE OF ACTION:
### Monopolization in Violation of the Arkansas Unfair Practices Act

107.    Counterclaim-Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

108.    As alleged above, J.B. Hunt and its co-conspirators entered into and engaged in a horizontal combination or conspiracy in restraint of trade to restrict competition in the trucking brokerage market and to jointly boycott TruckSmarter, an entity that would introduce load board competition in the United States, including in the state of Arkansas, in violation of Ark. Code § 4-75-301 *et seq*.  Such combination or conspiracy constitutes unfair and discriminatory practices by which fair and honest competition is destroyed or prevented in violation of Arkansas state antitrust laws and is, moreover, an unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale.

109.    As alleged above, J.B. Hunt and its co-conspirators also engaged in unfair and discriminatory practices by deliberately obscuring price information, entering into illegal contracts, and engaging in unfair trade practices, in violation of Ark. Code § 4-75-201 *et seq*.  Such practices destroy or prevent fair and honest competition in violation of Arkansas state antitrust laws.

110.    As a direct and proximate result of J.B. Hunt's actions, competition in the motor carrier load app market has been severely curtailed.  TruckSmarter has been injured and financially damaged in amounts that are presently undetermined.  Its damages are directly attributable to J.B. Hunt's conduct, which was intended to financially injure TruckSmarter and drive it out of the market.    TruckSmarter's injuries consist of artificially inflated costs or deflated proceeds associated with freight load boards in the United States caused by J.B. Hunt's misconduct. TruckSmarter's injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes J.B. Hunt's conduct unlawful.

## **PRAYER FOR RELIEF**

WHEREFORE, TruckSmarter prays for judgment as follows:

a.      A judgment denying each and every one of J.B. Hunt's claims against TruckSmarter with prejudice;

b.      A declaration that TruckSmarter has not misappropriated, either directly or indirectly, any valid trade secret.

c.      A declaration that the purported trade secrets of the case-in-suit are not protectable;

d.      A declaration that TruckSmarter did not tortiously interfere, either directly or indirectly, with any business relation of J.B. Hunt's;

e.      An injunction pursuant to 15 U.S.C. § 26 barring J.B. Hunt from conspiring to boycott TruckSmarter in violation of the antitrust laws;

f.      An award to TruckSmarter for damages in an amount to be proven at trial, including treble damages pursuant to 15 U.S.C. § 15;

g.      TruckSmarter's costs in the prosecution of these counterclaims, including reasonable attorneys' fees;

h.      A declaration that this case is exceptional and an award to TruckSmarter of its reasonable costs and expenses of litigation, including attorneys' fees and expert fees;

i.      Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

111.    In accordance with Rule 38 of the Federal Rules of Civil Procedure, TruckSmarter respectfully demands a jury trial of all issues triable to a jury in this action.

Dated:  November 15, 2023

Respectfully submitted,

/s/ *William R. Sears*

Brandon B. Cate
Ark. Bar No. 2001203
Sharri A. Bell
Ark. Bar No. 2021138
Attorneys for the Defendant
QUATTLEBAUM, GROOMS & TULL PLLC
4100 Corporate Center Drive, Suite 310
Springdale, Arkansas 72762
Telephone: (479) 444-5200
Facsimile: (479) 444-6647
E-Mail: bcate@qgtlaw.com
E-Mail: sbell@qgtlaw.com

Michael B. Heister
Ark. Bar No. 2002091
QUATTLEBAUM, GROOMS & TULL PLLC
Attorneys for the Defendant
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 379-1700
Facsimile: (501) 379-1701
E-Mail: mheister@qgtlaw.com

Renita Sharma (*pro hac vice*)
Hope Skibitsky (*pro hac vice*)
Zane Muller (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Attorneys for the Defendant
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
E-mail: renitasharma@quinnemanuel.com
E-mail: hopeskibitsky@quinnemanuel.com
E-mail: zanemuller@quinnemanuel.com

William R. Sears (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA
Telephone: (213) 443-3000

*Attorneys for Defendant/Counterclaim-Plaintiff*
*TruckSmarter, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of November, 2023, I caused to be filed a copy of the foregoing with the Clerk of the Court using the ECF electronic filing system, which shall send notification of such filing to the following counsel of record for plaintiff:

**Marshall S. Ney, Esq.**
- mney@fridayfirm.com; cprince@fridayfirm.com; eanderson@fridayfirm.com

**Katherine Church Campbell, Esq.**
- kcampbell@fridayfirm.com; cprince@fridayfirm.com; eanderson@fridayfirm.com

By:  /s/ Zane Muller

91